734 A.2d 798 (1999)
324 N.J. Super. 114
Candi WIGGINTON,[1] Plaintiff Respondent/Cross-Appellant,
v.
Nicholas SERVIDIO, Glenn Perlakowski, and Gerardo Martinez, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 1999.
Decided July 1, 1999.
*799 William J. Finnerty, Bayonne, for defendants appellants/cross-respondents Nicholas Servidio and Gerardo Martinez (Hughes & Finnerty, attorneys; Mr. Finnerty, on the brief).
Stanley L. Goodman, Roseland, for defendant-appellant/cross-respondent Glenn Perlakowski (Grotta, Glassman & Hoffman, attorneys; Mr. Goodman, of counsel; Mr. Goodman and Heather R. Boshak, on the brief).
Neil H. Deutsch, Hackensack, for plaintiff-respondent/cross-appellant (Deutsch, Resnick, Green & Kiernan, attorneys; Mr. Deutsch, on the brief).
Before Judges PRESSLER, KLEINER, and STEINBERG.
The opinion of the court was delivered by KLEINER, J.A.D.
Plaintiff Candi Wigginton, a civilian employee of the United States Army, filed a complaint alleging that three of her civilian co-employees, one of whom was her supervisor, had committed the torts of assault, intentional infliction of emotional distress, and sexual harassment. Plaintiff's complaint demanded compensatory and punitive damages. At the close of plaintiff's case, the trial judge dismissed the intentional infliction of emotional distress claim as to all defendants and the assault claim against defendant Nicholas Servidio. At the close of all the evidence, the judge dismissed the assault claim against defendant Glenn Perlakowski. Plaintiff then voluntarily withdrew her assault claim against defendant Gerardo Martinez. Plaintiff also successfully moved to amend her pleadings to allege a sexual harassment claim under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42 ("LAD"), including a claim for attorney's fees and costs, in substitution for her original claim of sexual harassment.
The jury returned a verdict in favor of plaintiff and against all defendants for *800 $300,000 in compensatory damages. Following a short trial before the same jury, plaintiff was awarded punitive damages as follows: $1,000 payable by Servidio, $1,000 payable by Perlakowski, and $500 payable by Martinez.
All defendants moved for judgment notwithstanding the verdict, a new trial, or a remittitur. Plaintiff moved for an award of counsel fees. The trial judge denied defendants' motions for judgment notwithstanding the verdict and a new trial, but granted defendants' remittitur motion and reduced plaintiff's compensatory damage award to $90,000. Plaintiff was granted $37,390.48 as attorney's fees and costs.
The primary question posed by defendants' appeal[2] is whether the 1972 amendment to Title VII, 42 U.S.C.A. § 2000e-16, precludes the courts of this State from considering the merits of plaintiff's LAD claim asserted against her federal co-employees. A secondary question posed by plaintiff's cross-appeal is the propriety of the dismissal of her claims for assault and intentional infliction of emotional distress. We conclude that the courts of this State lack subject matter jurisdiction to consider a LAD claim asserted by a federal employee against co-employees. We also conclude that although the trial judge correctly dismissed plaintiff's claim for tortious assault, he erred in dismissing plaintiff's complaint alleging tortious infliction of emotional distress. We affirm in part, reverse in part, and remand for a new trial on the issue of intentional infliction of emotional distress.

I
In March 1994, plaintiff was employed by the United States Army as a civilian employee in the community service office at the Military Ocean Terminal in Bayonne, New Jersey. She oversaw various programs for the families of soldiers, including family advocacy, army emergency relief, and relocation. Plaintiff was married to an Army career officer and resided with him and their three children.
Defendant Perlakowsi had been plaintiff's, superior for all six years that she worked at the military terminal, but he became her direct-line supervisor during the last year of her employment. Perlakowski's office was not in the same building as plaintiff and he rarely visited plaintiff's office. Defendants Martinez and Servidio were supervisors in other departments.
According to plaintiff's testimony, the building where she worked was isolated from the others at the terminal. Behind the building were railroad tracks and a concrete road with a posted "No through traffic" sign. Customers used the front door to the building and employees used the back door. Whenever plaintiff was in the building by herself, she would lock the back door. In addition, plaintiff claimed that the base was usually deserted at lunch hour and that Perlakowski knew that she was usually in the building by herself at this hour because she stayed in for lunch.
On the morning of March 16, 1994, at about 11:30 a.m., Rudy Sauter, one of plaintiff's program directors, came into plaintiff's office while she was assisting a client and told her that her boss, Perlakowski, was there to see her. He was behind the building, accompanied by Martinez and Servidio. Plaintiff instructed Sauter to tell him that she was with a client and that she would be done in about fifteen to twenty minutes. By the time plaintiff finished with her client, defendants had left.
At about noon that day, both Sauter and the receptionist, who worked in plaintiff's building, left for lunch. Plaintiff was *801 alone in the office when she saw a van belonging to Martinez's girlfriend coming down the road behind the building. All three defendants were in the van. The men parked the van against the back door and against a concrete landing platform. Plaintiff met the men outside the back door just as Martinez was coming into the building. He told plaintiff that her boss wanted to talk to her.
The rear door to the building, which was directly behind plaintiff, opened outward. Because the van was parked so closely to the building, its door, when opened, came very close to the door to the building, blocking plaintiff to the right. The van was directly in front of her, and Martinez was to her left. Hence, her only exit was behind her, back into the building.
According to plaintiff, Perlakowski, who was sitting in the center of the back seat of the van, had a "weird" look on his face but did not say anything. Servidio was in the front passenger seat and had his hands over his face and was turning red, as if he were embarrassed. Martinez prompted Servidio and said, "Come on, you said you had something to tell her." Plaintiff asked Perlakowski what was going on.
Martinez then said to plaintiff, "Your boss said you'd give him a blow job." Servidio added, "Yeah, and he said we can watch." Although Perlakowski said nothing, plaintiff claimed that he moved to the edge of his seat as he put his hands on his spread-apart knees, "like he was ready for me to perform some kind of act." Plaintiff realized that she had to remove herself from the area as quickly as possible because she thought something physical was going to happen to her.
As plaintiff turned to go back into the building, she had to push Martinez's arm out of her way. As she did so, she felt him grab her own arm. She then slammed the door behind her and locked it. She also locked the door to the front of the building and the door to her office. She admitted that the entire incident lasted seven to eight minutes and that no one tried to stop her from going back into the building. Also, she admitted that Martinez never tried to grasp her arm; rather, he put his hand on her arm as if to say, "Wait a minute." According to plaintiff, she "freaked." She was extremely upset, crying, stunned, and scared. She also felt betrayed because one of the men was her supervisor. However, she admitted that none of the defendants gestured to her in any way and that no one tried to physically push her into the van.
Defendants offered a different version of the incident. All three claimed that Perlakowski needed to see plaintiff about an overdue report. When she was unable to see him on their way to lunch, they decided to stop back after lunch. At that time, plaintiff came out of the building and stuck her head in the van in order to talk to Perlakowski about the report. She then conversed with both Perlakowski and Servidio about some events going on at the base. She appeared jovial and friendly and the mood was casual.
After stepping back from the van, plaintiff spoke to Martinez about something; neither Perlakowki nor Servidio could hear the conversation or see plaintiff's face. At one point, plaintiff stuck her head back into the van and asked Servidio what Martinez had just said. Servidio claimed he did not hear what Martinez said and would not have understood him anyway because he spoke with a Spanish accent. When plaintiff went back into the building, she did not seem upset.
Martinez claimed that what he actually said to plaintiff was, "Hey, you're going to be blowing your boss's job," referring to the overdue report. Both he and Servidio denied making the statements attributed to them by plaintiff, and Perlakowski denied moving forward in his seat or talking to his companions about his desire for oral sex.
*802 Plaintiff admitted that her perception of the situation was colored by an incident that had occurred when she was ten years old. She had been dragged off her bicycle at knife-point by two older boys and taken to a vacant house. Her mother walked in on the assault and pulled the boys off of her. She was taken to the hospital for unspecified injuries. She felt that when defendants surrounded her and made these comments to her, she was "put back into that situation."
When Sauter returned from lunch at 12:55 p.m., he found plaintiff crying in her office. She told him that Perlakowski and two of his friends had asked her for "sexual favors." Sauter helped plaintiff call her husband. When her husband arrived and was told what had occurred, he became very angry and called the commanding officer. The officer directed plaintiff to write a statement as soon as she could compose herself.
Perlakowski called plaintiff later that afternoon, ostensibly to ask her a workrelated question. Sauter monitored the conversation on a different extension, pursuant to instructions from the commanding officer. Because plaintiff was very curt with Perlakowski, he called back about forty minutes later and asked her if she was upset or angry. When she said she was, he apologized for himself and also on behalf of Servidio and claimed she must have misunderstood what was said. According to Sauter, who monitored this call also, Perlakowski apologized for what "Gerry and Nick" said and claimed he had no idea they were going to say what they did. He told plaintiff that "boys will be boys." Plaintiff responded to Perlakowski that she had not misunderstood and that his apology was not accepted.
About twenty minutes later, Martinez called plaintiff. According to plaintiff, Martinez said that his girlfriend told him to call because she knew plaintiff was upset, but he never actually offered an apology. According to Sauter, however, Martinez said he was sorry for what he said and claimed he was only joking around like he joked around with plaintiff's husband. Plaintiff would not accept his apology either.
Perlakowski claimed that he apologized to plaintiff only for making her upset. He thought she was upset because he had embarrassed her in front of the others for being late with her report. He acknowledged that he should have spoken to her privately about the matter. Servidio claimed that since he was in Perlakowski's office when the phone call was made, he told Perlakowski to apologize for him too. Martinez claimed that he apologized to plaintiff only because his girlfriend told him to. He had no idea why she was angry or for what he was apologizing.
Sauter monitored all of the calls into the building for the rest of the day. About a week later, plaintiff received two anonymous calls at work, both on the same day, threatening her that if she went forward with the investigation she would be "really sorry." The caller warned her that she was in "Mafia town" and that anything could happen. She didn't recognize the male voices and the Army never determined who made the calls.
As a result of the Army's investigation, all three men were found to have engaged in inappropriate conduct and were given letters of reprimand. Martinez was suspended for one day. However, plaintiff was not satisfied with the lenient punishment.
Following the incident, plaintiff continued to work until June 2, 1994, when she was granted a thirty-day medical leave of absence, which was eventually extended another thirty days. Prior to June 2, 1994, plaintiff settled her claim against the Army by agreeing not to institute legal action if it turned over everything in its investigation files, restored her lost sick time, paid for her attorney's fees, transferred her to another military installation, *803 and paid for the transfer to a military station in Beaumont, Texas.[3]
Plaintiff claimed that prior to her transfer she was continuously upset at work. She claimed she suffered nausea and diarrhea and had difficulties in her personal relationship with her husband and children. Plaintiff spoke with an Army base chaplain, with a medical officer, Dr. Steven Smith, and was referred by him to Edith Grant, a licensed clinical social worker, who conducted one interview session with plaintiff on June 2, 1994.
At trial, both Dr. Smith and Grant testified as fact witnesses. Dr. Smith described plaintiff as "distraught." Grant described plaintiff as "quite distressed, frightened, and depressed." Although Grant scheduled a second appointment, plaintiff failed to attend that appointment.

II
On appeal defendants, for the first time, contend that the judgment must be vacated as the trial court lacked subject matter jurisdiction. The defense of lack of subject matter jurisdiction, R. 4:6-2(a), may be asserted at any time. See Hamilton, Johnston & Co., Inc. v. Johnston, 256 N.J.Super. 657, 662, 607 A.2d 1044 (App. Div.), certif. denied, 130 N.J. 595, 617 A.2d 1219 (1992); Pressler, Current N.J. Court Rules, comment on R. 4:6-7 (1999); see also Peper v. Princeton Univ. Board of Trustees, 77 N.J. 55, 65-66, 389 A.2d 465 (1978) (subject matter jurisdiction may not be conferred by waiver resulting from a party's failure to interpose a timely objection thereto).[4]
Discrimination against federal government employees is prohibited by 42 U.S.C.A. § 2000e-16. The statute originated in § 717 of the Civil Rights Act of 1964, and was amended by § 11 of the Equal Employment Opportunity Act of 1972. The 1972 amendment gave federal government employees the right, following the exhaustion of certain administrative remedies pursued with the Civil Service Commission, to bring a civil action solely against the head of the department or agency involved. 42 U.S.C.A. § 2000e-16(c).
In Brown v. General Servs. Admin., 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the United States Supreme Court considered the issue of whether the statute as amended provided the exclusive judicial remedy for claims of discrimination in federal employment. Id. at 824-25, 96 S.Ct. at 1964, 48 L.Ed.2d at 407. In answering that question in the affirmative, the Court noted that, until amended in 1972, Title VII of the Civil Rights Act of 1964 did not protect federal employees. That is, prior to 1972, the availability of either administrative or judicial relief for federal employment discrimination was "far from sure" because each federal agency handled its own charges administratively. Id. at 825, 96 S.Ct. at 1964, 48 L.Ed.2d at 407. An aggrieved federal employee did not have access to the courts and had to overcome the governmental defense of sovereign immunity or failure to exhaust administrative remedies. Id. at 827, 96 S.Ct. at 1965, 48 L.Ed.2d at 408.
According to the Court, the intent of Congress in 1972 was to create an exclusive *804 and preemptive administrative and judicial scheme for the redress of federal employment discrimination. The Court reached this conclusion by analyzing the structure of the amendment itself and the far-reaching and comprehensive relief which it provided. Id. at 829-32, 96 S.Ct. at 1966-68, 48 L.Ed.2d at 409-11.
Based upon Brown, if plaintiff had attempted to sue the Army under the LAD, she would have been barred. Although plaintiff could have sued the Army in the Law Division under the federal statute, Hernandez v. Region Nine Housing Corp., 146 N.J. 645, 652, 684 A.2d 1385 (1996) (Title VII claims can be adjudicated in state court), plaintiff settled her claims against the Army prior to instituting this action against her co-employees under the LAD.[5]
Numerous circuit and district courts have held that the decision in Brown operates to bar non-Title VII discrimination suits against not only the government employer but also individual co-employees. See, e.g., Ramey v. Bowsher, 915 F.2d 731, 734 (D.C.Cir.1990) (plaintiff's claims for libel, slander, fraud, and conspiracy were barred by doctrine of absolute immunity for federal employees; to the extent plaintiff tried to recast his tort claims against his supervisors as pure discrimination claims, they were barred by exclusive character of Title VII remedy), cert. denied, 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); White v. General Servs. Admin., 652 F.2d 913, 916 (9th Cir. 1981) (Brown did not distinguish between suit against government or individual employees; allowing remedies against individuals would interfere with carefully devised statutory scheme by permitting circumvention of administrative remedies); Newbold v. United States Postal Serv., 614 F.2d 46, 47 (5th Cir.) (Brown`s broad language on preemption and exclusivity suggests that there is no cause of action against individual employees under other federal statutes), cert. denied, 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980); Holloway v. Bentsen, 870 F.Supp. 898, 902 (N.D.Ind.1994) (federal employee cannot proceed with employment discrimination suit against federal supervisors in their individual capacities under other federal statutes which vindicate rights protected by Title VII); Clement v. Motta, 820 F.Supp. 1035, 1037-38 (W.D.Mich.1991) (because gravamen of plaintiff's complaint was discrimination, his claim was cognizable only under Title VII; his cause of action under Michigan's Civil Rights Act was also preempted by Title VII); Baird v. Haith, 724 F.Supp. 367, 378-79 (D.Md.1988) (weight of authority is that Title VII, as interpreted by Brown, prevents federal employees from recovering from their supervisors as individuals for causes of action arising from employment discrimination; Title VII also bars suits against individual supervisors on other causes of action, be they civil, constitutional, or under state law, when gravamen of complaint arises from employment discrimination); DiPompo v. West Point Military Academy, 708 F.Supp. 540, 547 (S.D.N.Y.1989) (allowing federal employee to sue individuals for violating state human rights law would permit him to circumvent Brown`s holding).
The Ninth Circuit has also analyzed whether a non-Title VII suit against the individual defendant alleges "highly personal" wrongs. If it does, then the plaintiff has been allowed to proceed. See, e.g., Brock v. United States, 64 F.3d 1421, 1423 (9th Cir.1995) (Title VII is not exclusive remedy for federal employees who suffer "highly personal" wrongs such as defamation, harassment, and physical abuse and where the harms suffered involve more than just discrimination); Arnold v. United States, 816 F.2d 1306, 1311 (9th Cir. 1987) (remedy for actions other than employment discrimination, such as sexual *805 harassment and assault, even if arising from the same set of facts, is not barred by Title VII); Otto v. Heckler, 781 F.2d 754, 757 (torts which constitute highly personal violations beyond the meaning of discrimination are separately actionable), modified on other grounds, 802 F.2d 337 (9th Cir.1986).
However, Owens v. United States, 822 F.2d 408 (3d Cir.1987), may arguably be read as contra to Brown, although a close reading of Owens reflects that Owens considered whether a federal employee could pursue state constitutional and common law claims against a co-employee accused of sexually harassing her, and depended on whether the defendant could raise the defense of absolute immunity. The issue of immunity is not raised in this appeal and our opinion must be construed as limited to issues of subject matter jurisdiction. Additionally, the state claims asserted in Owens were assault, battery, harassment, and intentional infliction of emotional distress, id. at 410 n. 1, and were not the equivalent of a hostile work environment sexual harassment claim under the LAD. Owens also concluded that all other federal claims against the co-employee would be barred due to Title VII's exclusivity. Id. at 411.
A few courts take the view that all claims against individual defendants should be allowed to proceed, regardless of their nature. See Wood v. United States, 760 F.Supp. 952 (D.Mass.1991), aff'd, 995 F.2d 1122 (1st Cir.1993) (en banc) (without specifically deciding whether Title VII is the exclusive remedy available to federal employees when suing other federal employees in their individual capacities); Langster v. Schweiker, 565 F.Supp. 407 (N.D.Ill.1983); Neely v. Blumenthal, 458 F.Supp. 945 (D.D.C.1978) (decided prior to Ramey, supra, 915 F.2d 731).
We see no reason to formulate a conclusion contrary to greater weight of authority which has interpreted Brown to mean that a federal employee's suit to redress discrimination in the workplace must proceed in accordance with the scheme established by Congress in 42 U.S.C.A. § 2000e-16. This interpretation does not preclude the federal employee from pursuing other legal claims against co-employees, such as plaintiff's claims for assault or intentional infliction of emotional distress.

III
On plaintiff's cross-appeal she contends the trial judge erred by dismissing her complaint for assault against defendants Perlakowski and Servidio and her claim for intentional infliction of emotional distress as to all defendants.

A.
At the close of plaintiff's case, the trial judge dismissed the assault charge against Servidio on the ground that there was no allegation against him that he had ever touched plaintiff or that he had moved in such a manner as to make plaintiff believe that he was about to do so. The trial judge noted that plaintiff testified that Perlakowski moved forward in his seat within the van causing plaintiff to perceive that he was prepared to accept oral sex from plaintiff. Perlakowski denied moving his seated position.
The trial judge acknowledged that no particular degree of force or violence is necessary for an assault and that threatening someone in a rude or angry manner so as to put that person in fear of bodily harm could constitute an assault. The judge concluded that, even taken in the light most favorable to plaintiff, there was no effort made by either defendant to force plaintiff into the van. The words spoken to plaintiff were not spoken in a forceful, angry, offending, rude, or insolent manner such that it was obvious that defendants were about to physically attack plaintiff. The judge distinguished plaintiff's claim against Martinez who plaintiff claimed had actually touched her arm in an effort to induce plaintiff to "wait."
*806 Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969), defines the standard for deciding a motion for judgment or a motion for judgment notwithstanding the verdict, which is the same as the standard governing a motion for dismissal at the close of plaintiff's case. The judge must accept as true all the evidence favoring the party opposing the motion and must accord that party the benefit of all legitimate inferences therefrom. If the party opposing the motion is deemed to have made a sufficient prima facie showing to permit reasonable minds to differ as to the result, the motion must be denied. We conclude the trial judge properly utilized the appropriate analysis in his decision to dismiss plaintiff's assault claim as to both defendants Perlakowski and Servidio and in denying that same relief as to defendant Martinez.[6]
According to Restatement (Second) of Torts § 21 (1965):
(1) An actor is subject to liability to another for assault if
(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
(b) the other is thereby put in such imminent apprehension.
However, "courts have been reluctant to protect extremely timid individuals from exaggerated fears of contact, and have often stated that the apprehension must be one which would normally be aroused in the mind of a reasonable person." Prosser & Keeton on Torts § 10 at 44 (5th ed.1984).
We evaluated idiosyncratic reactions of a claimant in Hall v. Heavey, 195 N.J.Super. 590, 481 A.2d 294 (App.Div.1984). There, the grocery manager of a store approached the plaintiff in a parking lot and screamed at her to open her pocketbook. When she offered the pocketbook to him, he snatched it out of her hands but never touched her. Id. at 593, 481 A.2d 294. We affirmed the dismissal of an assault charge against the defendant on the ground of insufficient proof. Id. at 597, 481 A.2d 294. Utilizing the Dolson standard, we cannot conclude, in light of the holding in Hall, that the trial judge erred in dismissing plaintiff's assault claim as to defendants Perlakowski and Servidio.

B.
Plaintiff contends that the judge erred in dismissing her claim for intentional infliction of emotional distress as to all defendants. We agree.
To establish a claim for intentional infliction of emotional distress plaintiff was required to establish: (1) that the defendant acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) that the defendant's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that the defendant's actions were the proximate cause of the emotional distress; and (4) that the emotional distress suffered was so severe that no reasonable person could be expected to endure it. Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988).
In Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998), the Supreme Court considered this cause of action in the context of a hostile work environment claim predicated on a single comment, an offensive racial slur. Although Taylor recognized that liability does not extend to mere insult, indignities, or other "trivialities," it nevertheless concluded that a racial slur uttered by a supervisor to a subordinate cannot be deemed a mere insult as a matter of law. Rather, a jury should be allowed to determine whether the remark was outrageous. 152 N.J. at 509-10, 706 A.2d 685.
*807 The Court also recognized that a single racial slur uttered by a "stranger on the street" could not amount to extreme and outrageous conduct; however, the power dynamics of the workplace changes the equation. Id. at 511, 706 A.2d 685. That is, courts have recognized that employees are entitled to greater protection from insults than strangers and that employers have a higher duty than strangers to avoid inflicting emotional distress. Id. at 512, 706 A.2d 685. The employer's position of authority and power over the plaintiff and the abuse of the employer-employee relationship can both contribute to a finding of extreme and outrageous conduct. Ibid.
As in the case of proving a hostile work environment, a single event or comment will usually be insufficient to hold a defendant liable. However, one racial slur uttered in the workplace by a highranking official may present such an unusual circumstance and the issue is one for the factfinder. Id. at 512-13, 706 A.2d 685. Similarly, the defendant's intent to cause emotional distress, which may be inferred from the remark itself, is a question for the factfinder. Id. at 513-14, 706 A.2d 685.
Here, defendants were not strangers on a street. Perlakowski was plaintiff's supervisor, and defendants Servidio and Martinez held supervisory positions albeit not in plaintiff's specific work area. Standards of decency and civility are different in the workplace where employers, supervisors, or mere co-employees are not strangers to one another. A comment that might otherwise be regarded as a part of everyday living, no matter how vulgar or rude, can take on entirely different connotations when uttered by a supervisor or coemployee in the workplace. We conclude that each defendant's intent to cause emotional distress, which may be inferred from the remarks uttered to plaintiff, was a question for the factfinder. Id. at 513-14, 706 A.2d 685. This is particularly so, where, as here, plaintiff testified to the severity of her reaction which was verified by the observations of Dr. Smith and Gates. See Buckley v. Trenton Sav. Fund, supra, 111 N.J. at 367, 544 A.2d 857.
Although in Buckley the Court found that mere allegations of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep," were insufficient as a matter of law to support a finding of severe mental distress that no reasonable person could be expected to endure, 111 N.J. at 368, 544 A.2d 857, nonetheless plaintiff's proofs encompassed a reaction to the event which, if believed by the fact finder, lasted a considerable period after the event and was more substantial than the effect upon the plaintiff in Buckley, although less severe than the reaction to the plaintiff in Taylor, supra, 152 N.J. at 514, 706 A.2d 685.
We recognize that defendants' conduct must be sufficiently severe to cause genuine and substantial emotional distress or mental harm to the average person and that a plaintiff cannot recover for idiosyncratic emotional distress that would not be experienced by average persons. Id at 516, 706 A.2d 685; Williamson v. Waldman, 150 N.J. 232, 250, 696 A.2d 14 (1997). Submitting the issue to the factfinder with a careful instruction that defendants are not held liable when a hypersensitive plaintiff suffers severe emotional trauma from conduct that would not seriously harm most people, Taylor, supra, 152 N.J. at 516, 706 A.2d 685, serves the interests of justice to a greater degree than a dismissal at the close of the proofs utilizing the standard enunciated in Dolson, supra, 55 N.J. at 5-6, 258 A.2d 706.
The judgment for plaintiff on the LAD claim is reversed. The judge's decision dismissing plaintiff's assault claim is affirmed. The judgment of dismissal as to plaintiff's claim of intentional infliction of emotional distress as to all defendants is reversed and that claim is remanded for a new trial limited solely to that claim.
NOTES
[1] Plaintiff's name is also spelled "Wiggington" in appellant's brief, and spelled "Candie" in respondent's brief.
[2] Subsequent to the filing of defendants' notice of appeal, defendant Nicholas Servidio died. As of the date of oral argument, Servidio's estate had not been substituted as a party defendant. We have opted to consider the appeal despite the failure of formal substitution of the proper party for the Estate of Nicholas Servidio. See R. 4:34-1; see also Campione v. Adamar of N.J., 155 N.J. 245, 269-70, 714 A.2d 299 (1998).
[3] Prior to the March 16, 1994 incident, plaintiff's husband had planned to retire from the Army. Plaintiff's family had plans to relocate to Mississippi. The relocation occurred after June 2, 1994. Due to plaintiff's assignment to Beaumont, Texas, plaintiff was separated from her family during the week, traveling to Mississippi on weekends. That arrangement lasted eight months. Plaintiff's damage claim encompassed claims attributed to this forced separation. Additionally, plaintiff claimed that she accepted a new job in Mississippi which lasted forty-five days claiming that she had problems adjusting to working with a male supervisor. Thereafter, she accepted a new position working for and with women only.
[4] On appeal, plaintiff does not challenge defendants' contention on the ground that defendants failed to raise the lack of subject matter jurisdiction prior to trial in the Law Division.
[5] Plaintiff could not have brought any claim against the individual co-employees under the federal statute as the only proper defendant in such an action is the head of the agency or department involved. 42 U.S.C.A. § 2000e-16(c).
[6] As noted supra, plaintiff voluntarily dismissed her assault claim as to defendant Martinez prior to the submission of the case to the jury.