25 A.3d 1191 (2011)
422 N.J. Super. 12
Cecelia Mavica INGRAHAM, Plaintiff-Appellant,
v.
ORTHO-McNEIL PHARMACEUTICAL, Johnson & Johnson, and Carl DeStefanis, Defendants-Respondents.
No. A-2216-10T2.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 2011.
Decided August 25, 2011.
*1192 Neil Mullin, Montclair, argued the cause for appellant (Smith Mullin, P.C., and Niedweske Barber, P.C., attorneys; Mr. Mullin, and Kevin E. Barber, of counsel and on the brief).
Francis X. Dee, argued the cause for respondents (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Mr. Dee, of counsel and on the brief; David J. Reilly, *1193 and David M. Alberts, Morristown, on the brief).
Before Judges FUENTES, ASHRAFI and NEWMAN.
The opinion of the court was delivered by
ASHRAFI, J.A.D.
Plaintiff Cecelia Mavica Ingraham appeals from a December 3, 2010 order dismissing by summary judgment her complaint alleging intentional infliction of emotional distress. We affirm.
Viewing the evidence most favorably to plaintiff, see R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), the deposition of plaintiff and unrefuted evidence in the summary judgment record show the following relevant facts.
Plaintiff was employed from 1994 to 2006 by defendant Ortho-McNeil Pharmaceutical. In 2006, she was working as an administrative assistant in a marketing department at defendant's Raritan facility. Plaintiff's immediate supervisors reported to defendant Carl DeStefanis, the director of the department. Plaintiff had infrequent contact with DeStefanis, "usually a simple `Hello, how are you' type of interaction."
In 2003, plaintiff's only child, Tatiana, then in her third year of high school, was diagnosed with acute lymphocytic leukemia. Tatiana was an excellent student with bright prospects. She was a member of the National Honor Society, National Latin Society, and National Art Society. She was accepted to Cornell University and planned to study biology as a pre-med student. She had also studied at the New Jersey School of Ballet, but was unable to continue dancing when her illness occurred. After several months in remission, Tatiana relapsed in April 2005. She developed an incurable infection and, sadly, passed away in May 2005. Her high school graduated her posthumously with top honors.
Plaintiff's mourning was deep and enduring. To honor the memory of her daughter, plaintiff kept pictures of Tatiana and her ballet slippers displayed in her cubicle at work.
About one-and-a-half years after Tatiana's death, a human resources manager at Ortho-McNeil, Carmen Harris, met with DeStefanis to convey complaints she had received about plaintiff's conduct and interaction with co-workers. Several of those complaints were unrelated to Tatiana, but administrative staff in the department had also remarked about plaintiff's tendency to speak to them about Tatiana's tragic passing. The co-workers said they sympathized with plaintiff, but they felt uncomfortable and at a loss for "what else that we can say that we have not said already." The co-workers said they tended to avoid contact with plaintiff and to take work or questions elsewhere. Harris suggested that DeStefanis talk to plaintiff to get her side of the complaints and to discuss her initiating conversations about Tatiana and its effect on her co-workers. DeStefanis agreed to speak with plaintiff.
On Friday, November 17, 2006, De-Stefanis met with plaintiff at four o'clock in the afternoon. They were alone in a human resources conference room. Once seated, DeStefanis told plaintiff he had several complaints concerning her speaking of her daughter and displaying pictures, and that the pictures needed to be removed. Upon hearing this, plaintiff became very upset. She testified in deposition that she started shaking. Plaintiff said to DeStefanis that she did not understand, and DeStefanis repeated that there were complaints about plaintiff's pictures *1194 and her daughter's ballet slippers, and they had to be taken down from her cubicle.
Plaintiff protested that she works with highly educated people and did not understand that they could not tolerate pictures of her daughter or the fact that she was a depressed, grieving mother. DeStefanis said again that the pictures had to be taken down because it was a disruption in the workplace, and people were avoiding her. DeStefanis also said that plaintiff could "no longer speak of [her] daughter because she is dead." Plaintiff felt hysterical. She told DeStefanis that "Tatiana was a very beautiful human being and everyone that met her was honored and blessed." She asked if DeStefanis was telling her to "act [as] if she did not exist." DeStefanis answered "yes."
Plaintiff was in shock and disbelief. She asked DeStefanis who was complaining, but he would not give names. She asked if the problem was her work performance, and he replied it was not. DeStefanis then said: "If you have the need or urge to talk about her you can come into my office and speak of her behind closed doors."
In addition to the discussion about Tatiana, DeStefanis asked plaintiff about the unrelated complaints reported to him, and plaintiff denied that the incidents were as described, or she otherwise explained her version of the incidents.
The conversation ended in a half hour or less, but to plaintiff it seemed to have lasted "forever." Plaintiff's phone rang, her husband calling to see where she was, and she left the meeting. Plaintiff perceived DeStefanis as having been "cold" but not angry. She also did not feel angry; rather, she was "extremely distraught and upset" and "outraged" and "hurt."[1]
Plaintiff left work that afternoon "crying" and "sobbing." She never returned. Over the next few days, she went to her cardiologist for heart palpitations and subsequently was treated with an angioplasty procedure and medication. She took short-term disability leave and eventually resigned from her job.
Plaintiff filed a three-count complaint in Middlesex County in April 2008. The complaint alleged violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, intentional infliction of emotional distress, and constructive discharge. The parties engaged in a full course of discovery. Defendants moved for summary judgment in October 2010. In response, plaintiff stipulated to dismissal of her LAD and constructive discharge claims and opposed only defendants' motion for summary judgment on her claim for intentional infliction of emotional distress. After hearing oral argument, the trial court granted defendants' motion and dismissed that remaining count. This appeal followed.
The elements of the common law cause of action for intentional infliction of emotional distress were set forth definitively *1195 in Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 544 A.2d 857 (1988). First, plaintiff must prove that defendant acted intentionally or recklessly. Id. at 366, 544 A.2d 857. Defendant must intend "both to do the act and to produce emotional distress." Ibid. A defendant may also be liable when he "acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." Ibid.
Second, plaintiff must prove that defendant's conduct was "extreme and outrageous." The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and putterly intolerable in a civilized community." Ibid. (citations omitted).
Third, plaintiff must prove defendant's conduct was a proximate cause of plaintiff's emotional distress. Ibid. (citations omitted).
Fourth, "the emotional distress suffered by plaintiff must be so severe that no reasonable [person] could be expected to endure it." Id. at 366-67, 544 A.2d 857 (citations and quotations omitted). When conduct is directed at plaintiff, she need not prove physical injury. Id. at 367, 544 A.2d 857. It is sufficient that the conduct produced emotional distress that is severe. Ibid.
In reviewing a grant of summary judgment, we apply the same standard under Rule 4:46-2(c) that governs the trial court. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007). We must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540, 666 A.2d 146. However, in the context of a claim for intentional infliction of emotional distress, "[t]he severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Buckley, supra, 111 N.J. at 367, 544 A.2d 857.
Here, for purposes of summary judgment, defendants do not contest the third and fourth elements of the cause of action for intentional infliction of emotional distress. Their contention is that plaintiff cannot as a matter of law prove the first or second elements on this record: that defendants acted intentionally or recklessly, and that DeStefanis's conduct was extreme and outrageous. We agree with defendants' contentions.
Plaintiff must prove that defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Buckley, supra, 111 N.J. at 366, 544 A.2d 857. We have referred to this element as an "elevated threshold" that is satisfied only in extreme cases. Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 23, 766 A.2d 292 (App.Div.2001).
Conduct that has been found to meet this "elevated threshold," and thus to permit determination by a jury of potential liability, includes: (1) a county sheriff's using an atrocious racial slur to refer to an African-American employee, Taylor v. Metzger, 152 N.J. 490, 508-21, 706 A.2d 685 (1998); (2) a defendant teacher's false report that the plaintiff teacher, a practicing non-violent Buddhist, had threatened to kill her students, and arranging to have the plaintiff removed publicly from the *1196 school, allegedly in retaliation for rebuking the defendant's sexual advances, Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 568, 587-88, 969 A.2d 1097 (2009); (3) a supervisor and two co-workers at a military facility surrounding the plaintiff and making comments and gestures to suggest that she was to perform a sexual act on the supervisor while the others watched, followed by a threatening telephone call implying that the Mafia would become involved if the plaintiff pursued the investigation, Wigginton v. Servidio, 324 N.J.Super. 114, 119-20, 123, 130-32, 734 A.2d 798 (App.Div.1999), certif. denied, 163 N.J. 11, 746 A.2d 457 (2000); (4) a landlord's intentional shutting off heat, running water, and security in a rent-controlled building in an effort to induce the tenants to vacate, 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 455-57, 466, 471-75, 547 A.2d 1134, (App.Div.1988); and (5) a doctor's allegedly telling parents that their child was "suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix," Hume v. Bayer, 178 N.J.Super. 310, 319, 428 A.2d 966 (Law Div.1981).
On the other hand, our State courts have declined to find sufficiently extreme and outrageous conduct where: (1) the decedent's children from an earlier marriage were not informed about and thus excluded from a viewing at the funeral home after the decedent was murdered, Cole v. Laughrey Funeral Home, 376 N.J.Super. 135, 147-48, 869 A.2d 457 (App. Div.2005); (2) a supervisor expressed doubt that the plaintiff had been diagnosed with breast cancer, and then came near her "on the verge of physically bumping into [the plaintiff's] breast area as if to see" if she truly had a mastectomy, Harris v. Middlesex County College, 353 N.J.Super. 31, 36, 46-47, 801 A.2d 397 (App.Div. 2002); (3) managers at an appliance retailer brought theft charges against the plaintiff sales manager for selling a television to his brother-in-law below cost, Griffin, supra, 337 N.J.Super. at 20-25, 766 A.2d 292; and (4) the defendant in a divorce case had a long-term adulterous affair with her boss, Ruprecht v. Ruprecht, 252 N.J.Super. 230, 236-38, 599 A.2d 604 (Ch.Div. 1991).
Similarly, federal courts applying New Jersey tort law have declined to find sufficiently extreme and outrageous conduct where: (1) the plaintiff, a detective, was subjected to unusual discipline, including that he present himself for a psychiatric evaluation, Zamboni v. Stamler, 847 F.2d 73, 76, 80 (3d Cir.), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); (2) the plaintiff's co-workers treated her rudely and unprofessionally, called her names, and gestured in a physically intimidating manner, Ferraro v. Bell Atlantic Co., 2 F.Supp.2d 577, 589 (D.N.J.1998); and (3) derogatory gender-based comments were made to the plaintiff along with allegations that her fiancé was a "cheat" and a "liar," Obendorfer v. Gitano Group, Inc., 838 F.Supp. 950, 952, 955 (D.N.J.1993).
Citing Taylor, supra, 152 N.J. at 511-12, 706 A.2d 685; Leang, supra, 198 N.J. at 587-88, 969 A.2d 1097; and Wigginton, supra, 324 N.J.Super. at 131, 734 A.2d 798, plaintiff argues that the "power dynamics of the workplace" lessen plaintiff's burden in demonstrating extreme and outrageous conduct that satisfies the threshold for intentional infliction of emotional distress. While the employment relationship is a factor that must be considered, Taylor, supra, 152 N.J. at 511, 706 A.2d 685, all of those cases alleged outrageous workplace incidents of discriminatory conduct.
The law provides no different standard of proof that applies in the workplace from *1197 other places where emotional distress might result. The employer-employee relationship is no more special and conducive to emotional distress than, for example, a doctor-patient relationship, the relationship of a decedent's family to a funeral home, the tense relationship of a precarious tenancy where homes might be lost, or the relationship of a husband and wife in a hostile divorce.
Indeed, the workplace has too many personal conflicts and too much behavior that might be perceived as uncivil for the courts to be used as the umpire for all but the most extreme workplace disputes. We have previously said that conduct in the workplace will rarely be so egregious as to give rise to a claim of intentional infliction of emotional distress. Harris, supra, 353 N.J.Super. at 46-47, 801 A.2d 397. In Griffin, supra, we stated: "Except for the kind of aggravated discriminatory conduct involved in Taylor, [supra, 152 N.J. 490, 706 A.2d 685,] `it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'" 337 N.J.Super. at 23-24, 766 A.2d 292 (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988), cert. denied, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990)).
Like Taylor, but unlike this case, the employers' sexually harassing conduct in Leang, supra, 198 N.J. at 568, 587, 969 A.2d 1097, and Wigginton, supra, 324 N.J.Super. at 120, 734 A.2d 798, was also characterized by outrageous acts otherwise prohibited by the LAD and other anti-discrimination laws. Cf. Tarr v. Ciasulli, 181 N.J. 70, 81-82, 853 A.2d 921 (2004) (damages are recoverable for emotional distress arising out of a claim of discrimination under the LAD where the distress does not rise to the level of severity required for the separate tort of intentional infliction of emotional distress).
To assess whether the evidence in this case will support a jury's finding that De-Stefanis's remarks and directive to plaintiff were "atrocious and utterly intolerable in a civilized community[,]" Buckley, supra, 111 N.J. at 366, 544 A.2d 857, we review closely plaintiff's own deposition testimony describing what DeStefanis said at the meeting:
Q: . . . So maybe to make this easier why don't we start from the beginning again. I want you to just focus on what was said, what he said and what you said, just what I would have heard out loud and not what you were feeling?
A: Okay. He said that he had several complaints from the managers and the directors about my pictures of my daughter who had passed away and I needed to take them down including her ballet slipper because when they come to my cubicle they're bothered by it. They're disturbed by her pictures because she's dead and he kept on saying that. Again, I was in shock. Okay? I didn't know what to say.
Then he also said to me: And when you come into the office you can no longer speak of her because she's dead. And I am not going to say how I felt. I was still in shock. Nothing was coming out of my mouth at the time because I was still in shock and I was in disbelief. Then he said to me: If you have the need or urge to talk about her you can come into my office and speak of her behind closed doors.
Q: Okay. Was anything else said out loud by either of you during that meeting other than what you just told me?
A: Well, I told you I said, I cannot believe that people were complaining about this. I wanted to know who they were. He would not give me their *1198 names. He told me that speaking of her and having her pictures in my cubicle was a disturbance to the work environment and also that's why people avoided me. And I said to him, I cannot believe that. I says, I don't see anybody avoiding me. They always come over, they give me my work.
Then he continued withhe says, Well, you have to take those pictures down because she's dead, your daughter is dead, and it bothers people. They have a problem with it. And you can no longer speak about her. And then I also said to him, I says, Carl, when was the last time did you see me break down and not do my job? And I even asked him, Is this a work performance issue? And he says, Oh absolutely not. And then again he said to me: But if you have the need or urge to talk about her, you can come into my office and speak of her.
Q: Was there anything else said out loud during that meeting other than what you've already told me?
A: No.
Plaintiff's description of the incident in her interrogatory answers did not add more relevant detail than her deposition testimony.
We conclude that, although plaintiff's version of the meeting would allow the jury to view DeStefanis as insensitive and perhaps negligent of plaintiff's vulnerability in her continuing bereavement, the conduct described does not meet the requisite standard to support a claim of intentional infliction of emotional distress. The trial court correctly determined that plaintiff could not prove the second essential element of her cause of action.
We also conclude that plaintiff's evidence was not sufficient to prove the first required element, that DeStefanis acted intentionally or recklessly to cause her severe emotional distress. Nothing in the record would allow a rational jury to find that DeStefanis intended to cause plaintiff emotional distress. His purpose was to address a workplace issue of efficiency and co-worker relationships. Plaintiff argues that her immediate supervisors did not know of any complaints from co-workers, but the human resources manager testified in deposition that such complaints were made to her. Furthermore, there is no evidence that DeStefanis had some ulterior, malicious motive in speaking to plaintiff.
The question for summary judgment is whether, viewing the evidence most favorably to plaintiff, a rational jury could conclude that DeStefanis acted recklessly in the meeting with plaintiff. To satisfy the element of recklessness, plaintiff must prove that defendant acted "in deliberate disregard of a high degree of probability that emotional distress will follow." Buckley, supra, 111 N.J. at 366, 544 A.2d 857; see Restatement (Second) of Torts § 46 comment i (1965). A person acts "recklessly" when he does, or intentionally does not do, an act "knowing or having reason to know of facts which would lead a reasonable [person] to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500. It is not enough for plaintiff to show that DeStefanis was cold and careless in his conduct, or negligent of her emotional state.
Furthermore, because the emotional distress must be severe, it is not enough for DeStefanis to have disregarded that some distress might result from his remarks; he must have disregarded that severe distress might result. DeStefanis testified that, before he met with plaintiff, *1199 he thought she "may get a little emotional, but . . . wasn't concerned about it" because he "didn't think it would be anything she really couldn't handle." Despite her frequent conversations about Tatiana, plaintiff had not previously broken down or become emotionally distraught while at work, at least not to DeStefanis's knowledge. DeStefanis's subjective belief is not determinative of whether he acted recklessly, but his testimony is consistent with an objective view of how an employer in his position might have perceived a stressful admonition of an employee.
There is no question that any reasonable employer should know that telling a grieving mother not to talk about her deceased daughter might cause emotional distress, but a severe reaction was not a risk that one should predict. An employer is not charged under tort law with a duty to avoid all emotional distress to employees, only such distress that is extreme, outrageous, and "utterly intolerable in a civilized community." Buckley, supra, 111 N.J. at 366, 544 A.2d 857. While the elements of the tort do not require that the employer predict the specific distress that the plaintiff will suffer, they do require that the employer deliberately disregard an unreasonable risk of severe distress.
Plaintiff argues that DeStefanis was reckless in repeating that her daughter was dead after he saw that she was upset and shaking, but her deposition testimony indicates that the repetition was in response to her saying she did not understand. The evidence does not allow an inference that DeStefanis intentionally repeated the comments either with intent to harm plaintiff or with deliberate disregard of that risk.
In sum, we conclude, as did the trial court, that the evidence, while troubling and naturally invoking sympathy for plaintiff, is not sufficient to support a cause of action for intentional infliction of emotional distress.
Affirmed.
NOTES
[1] As might be expected, DeStefanis's deposition testimony differed from plaintiff's version of the meeting. He testified that he began with a discussion of the complaints that were unrelated to Tatiana. Plaintiff's admission that the incidents had occurred caused De-Stefanis to think he could have a frank discussion with plaintiff, and he then turned to the issue of Tatiana. He focused on the discomfort felt by a few people in the department when plaintiff brought up the subject. He repeated his remarks several times because plaintiff did not seem to understand that people in the department were sympathetic but that she also needed to be "cognizant of how people are reacting to you." For purposes of summary judgment, we must view the evidence in the light most favorable to plaintiff and accept her version of the meeting. See Brill, supra, 142 N.J. at 540, 666 A.2d 146.