801 A.2d 397 (2002)
353 N.J. Super. 31
Gertrude HARRIS, Plaintiff-Appellant,
v.
MIDDLESEX COUNTY COLLEGE, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2002.
Decided July 3, 2002.
*398 Beth Haiet Meyer, West Orange, argued the cause for appellant (Alpert Butler Sanders & Norton, attorneys; David N. Butler, John H. Norton and Ms. Meyer, of counsel and on the brief).
Timothy D. Speedy, Morristown, argued the cause for respondent (Jackson Lewis Schnitzler & Krupman, attorneys; Mr. Speedy and Carla D. Macaluso, on the brief).
Donna Arons, Deputy Attorney General, argued the cause for amicus curiae New Jersey Division on Civil Rights (David Samson, Attorney General of New Jersey, attorney; Ms. Arons, on the brief).
Before Judges STERN, COLLESTER and PARKER.
The opinion of the court was delivered by *399 PARKER, J.A.D.
Plaintiff appeals from a grant of summary judgment dismissing her claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to 5-42. We affirm in part and reverse in part.
In September 1983, plaintiff began her employment at Middlesex County College (MCC) as an Instructor of Counseling in the Office of Educational Opportunity Fund (EOF) of the Division of Student Services. Plaintiff's duties involved helping EOF students with academic, personal, social or other problems enroll at MCC.
Dr. Fannie Gordon was a member of the committee that approved hiring plaintiff. Plaintiff was required to submit a re-application for appointment as a counselor each year, and each year Gordon recommended plaintiff's appointment. In 1984, Gordon was named Director of the EOF program. In July 1988, plaintiff was promoted to the rank of assistant professor on Gordon's recommendation.
On June 14, 1994, plaintiff requested Gordon's permission to take a personal leave on June 30 and July 1. Gordon asked plaintiff to reschedule her personal business because plaintiff's co-worker was going to be on vacation at the time. Plaintiff told Gordon that she did not believe she could reschedule because she was having breast reduction surgery.
On June 15, 1994, Gordon gave plaintiff her annual evaluation, telling plaintiff, "You've done a good job. You've done everything that you were supposed to do." Plaintiff and Gordon had gone over the evaluation and signed it the day before plaintiff went for surgery. Gordon told plaintiff, however, that she was going to try something different this year and gave each employee a self-evaluation form reviewing their strengths and weaknesses. That portion of plaintiff's evaluation was not completed prior to her surgery, however.
On June 30, 1994, plaintiff underwent surgery and learned that she had breast cancer. She returned to work on July 5, 1994. On July 6, 1994, plaintiff informed Gordon of her diagnosis and that she needed to extend her lunch hour because of a doctor's appointment. Gordon told plaintiff to take a half day, and plaintiff took a half medical day. Gordon denied refusing to allow plaintiff to take an extended lunch hour, however, and testified at her deposition that she granted plaintiff's every request for time off.
On July 7, plaintiff claims she requested another extended lunch hour for a doctor's appointment and that Gordon told her to take a half day. On July 13, the day before plaintiff's mastectomy, she submitted the self-evaluation form and was scheduled to meet with Gordon to discuss the evaluation. Gordon cancelled the meeting, however, indicating they would discuss it after plaintiff returned from her surgery.
On July 14, 1994, plaintiff had a mastectomy with reconstructive surgery. She returned to work on July 25 with her doctor's permission, although she testified that her doctor advised her to stay home for six to eight weeks. Plaintiff did not extend her medical leave because she could not afford to be on disability at two-thirds pay. Plaintiff's doctor did not place any restrictions on her activities, however, other than that she was not permitted to drive for four to five weeks.
Plaintiff claimed that the first day she returned to work after her mastectomy, she asked Gordon if she could leave early for a doctor's appointment if she took a shorter lunch. Plaintiff again claimed that Gordon told her to take a half day. Plaintiff claimed that shortly after the mastectomy, Gordon "appeared ... to be on the *400 verge of physically bumping into [plaintiff's] breast area as if to see if [plaintiff] really was as ill as everyone else knew that [she] was." Plaintiff also claimed that she heard through a third party that Gordon told another person that plaintiff was a "very angry woman" and that Gordon never heard of anyone having reconstructive surgery immediately after a mastectomy. Plaintiff interpreted these remarks as derogatory.
On August 13, 1994, plaintiff began the first of eight chemo-therapy treatments, occurring at three-week intervals. On those days, plaintiff took a paid half-day off from work. Plaintiff also had to visit her oncologist and plastic surgeon regularly, which she did during her lunch hours. At times, she was late returning from lunch because of these appointments. Gordon testified that plaintiff never asked for extended lunch periods for her medical appointments.
In August 1994, plaintiff met with Gordon to discuss her evaluation and claimed that Gordon was verbally negative about her performance. She did not receive a written evaluation with the negative remarks, however. In October 1994, when plaintiff still had not received a written evaluation from Gordon, she complained to her union representative. Gordon then asked plaintiff to write another self-evaluation in December and presented plaintiff with a written review which rated plaintiff's performance as "good" in four categories and "very good" in five categories. One negative comment was Gordon's statement that:
As your supervisor, I found during the 1993-94 Academic Year your biggest weakness to be your reluctance to accept supervision and constructive feedback. If you have any desire to grow professional[ly] as a counselor you must began [sic] to identify ways in which to overcome this weakness. Supervision is a vital element in developing effective counseling skills.
Gordon concluded the evaluation, noting:
When feedback is given in most cases it results in an unpleasant attitude on your part which makes for an unproductive work environment. It also develops into a negative attitude that produces unprofessional behavior
....
I am concerned about how you allow from time to time your personal affairs to interfere in the smooth operation of the EOF office. When requesting time off from work, appointments should not be confirmed until the time has been approved. Inappropriate personal messages are also left on the answering service as if this was your personal answering machine. This office cannot take the responsibility for your not taking care of your personal affairs in a timely manner.
Plaintiff disagreed with all concerns raised in the evaluation and filed a grievance through her union. The matter was settled, and the December evaluation was removed from her personnel file.
In February 1995, plaintiff began a course of tamoxifen treatment and had monthly doctors' appointments to monitor the medication. Plaintiff asked to work from 8:30 a.m. to 4:30 p.m. on those days. For the first three months, Gordon was on sabbatical, and plaintiff's acting supervisor approved the change in hours. When Gordon returned, however, she initially denied plaintiff's request, telling plaintiff to take a half day. Gordon ultimately granted the request after plaintiff spoke to her union representative and provided a doctor's note.
In 1995, plaintiff applied for a promotion in academic rank from assistant professor *401 to associate professor. Her union contract required that an associate professor have either a doctorate plus four years of appropriate experience or a master's degree plus thirty additional graduate credits and ten years of appropriate experience. At the time, plaintiff's educational background included a Bachelor of Science degree in elementary education and a Master of Education degree in student personnel services. Plaintiff was working toward her doctorate in adult education and had earned twenty-four credits toward that degree.
A Faculty Selection Committee reviewed plaintiff's eligibility and recommended the promotion but Gordon, as plaintiff's supervisor, did not. On June 25, 1995, Dean Michelle Goffe notified plaintiff that she would not be recommended for promotion and advised plaintiff to pursue certain career goals before re-applying. Plaintiff disagreed with the recommendation and filed a formal grievance with her union.
The union pursued plaintiff's complaint, alleging that Goffe's decision not to promote plaintiff was based upon Gordon's December 1994 evaluation which had been stricken from plaintiff's record. The matter was referred to a hearing officer who determined, after a hearing, that Goffe's decision was not based on the December 1994 evaluation. Rather, plaintiff failed to receive the promotion because she did not have the experience required.
In 1996, plaintiff once again applied for promotion. She then withdrew her request because she believed it would not be approved, given her relationship with Gordon. In March 1997, plaintiff's co-worker was promoted to associate professor.
In January 1998, plaintiff again applied for promotion. The faculty committee recommended the promotion but Gordon did not, stating that plaintiff had provided "little evidence to show that she attempted to accomplish more than the completion of her every day responsibilities." Gordon indicated that she would support plaintiff's promotion when plaintiff completed a transfer manual for EOF students, which she had been asked to do in September 1997.
On June 24, 1998, Goffe denied plaintiff's promotion on the ground that her performance profile did not reflect sufficient strength in all performance areas and provided suggestions to improve plaintiff's likelihood of promotion in the future. On July 15, 1998, plaintiff sent a memo to Goffe disputing the performance critique and asserting that there was no need to develop the transfer manual because she had already developed a handout for EOF students in 1993 and another staff member had prepared a manual. Plaintiff did not attempt to implement any of Goffe's suggestions after denial of her promotion in 1998. Plaintiff also acknowledged that she had not implemented any of the suggestions made since 1994 because she did not believe that the suggestions accurately reflected her performance.
In 2000, plaintiff once again applied for promotion. She had earned her doctorate in adult education in March 2000. In May 2000, however, Acting Dean Warren Keleman denied plaintiff's promotion on the ground that her profile did not reflect the "degree of excellence" required across the six-point criteria used to evaluate candidates for promotion. Keleman made recommendations for improvement.
Although plaintiff testified in her deposition that she had no physical limitations following her June 1994 surgery other than a four to five week driving restriction, she certified in opposition to the summary judgment motion that in September 2000 she was still unable to clean her home, to iron, or to lift heavy objects, but did not *402 explain how this affected her ability to perform her job responsibilities. She claimed that MCC, particularly Gordon, refused to make any accommodations for her physical limitations but did not articulate specific requests for physical accommodations. Plaintiff's primary complaint regarding accommodation concerned time to attend her doctors' appointments, but there is no evidence that she was ever prohibited from keeping any appointment.
On May 26, 1995, plaintiff filed her initial complaint with the New Jersey Division on Civil Rights (DCR), alleging discrimination on the basis of disability under the LAD, N.J.S.A. 10:5-1 to -42. Plaintiff subsequently amended her complaint to include allegations under the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101-12213 (1995). With the addition of the federal claims, the DCR forwarded the complaint to the Equal Employment Opportunity Commission (EEOC). On March 25, 1998, the EEOC sent plaintiff a right-to-sue letter, allowing her to file a civil complaint in federal court. On April 17, 1998, plaintiff filed the complaint in federal court, alleging discrimination on the basis of handicap in violation of the ADA and the LAD; failure to accommodate her request for leave to receive medical treatment; and violations of the federal Family and Medical Leave Act (FMLA), 29 U.S.C.A. §§ 2601-2654 (1999).
Extensive discovery was undertaken in the federal case and on October 29, 1999, defendant moved for summary judgment. On April 14, 2000, the Federal District Court granted defendant's motion, dismissing plaintiff's federal claims with prejudice and the state claims without prejudice.
On May 11, 2000, plaintiff filed a complaint in New Jersey Superior Court, alleging discrimination on the basis of a handicap in violation of LAD; failure to accommodate; and intentional infliction of emotional distress. Defendants again moved for summary judgment and, on November 8, 2000, the motion was granted. Plaintiff's motion for reconsideration was denied on January 29, 2001.
In granting the motion for summary judgment, the trial judge found that plaintiff failed to establish her prima facie case because she did not demonstrate that she was a member of a protected class as defined in the statute. While he recognized that plaintiff had a mastectomy in 1994, he noted that "she admitted in deposition to being cancer free. To date she has never suffered a recurrence of her cancer. She has no physical limitations at all.... [I]n her deposition there was nothing she admitted that she could not do." The court distinguished plaintiff's case from Blume v. Denville Township Board of Education, 334 N.J.Super. 13, 756 A.2d 1019 (App.Div.2000), in that the plaintiff in Blume had recurring cancer and was receiving treatment at the time that she was terminated from her employment. Moreover, the trial judge rejected plaintiff's claim that a mastectomy qualified as an "amputation" under N.J.S.A. 10:5-5(q). The trial judge further found that plaintiff's claims under the LAD were barred by the doctrines of res judicata and collateral estoppel because the federal court had already addressed the issues raised by plaintiff in her state court complaint.
On plaintiff's motion for reconsideration, the trial judge issued a written opinion in which he reiterated plaintiff's failure to make a prima facie case. He expressly rejected plaintiff's argument that her mastectomy six years before automatically placed her under the protection of the LAD and warranted an automatic trial by jury.
In this appeal, plaintiff argues:
POINT I
*403 THE TRIAL COURT IGNORED THE CLEAR LANGUAGE OF THE LAW AGAINST DISCRIMINATION IN RULING THAT SURVIVORS OF MASTECTOMIES AND OTHER AMPUTATIONS ARE NOT PROTECTED PERSONS UNDER THAT STATUTORY SCHEME.
POINT II
THE TRIAL COURT'S CONCLUSION THAT THE FEDERAL DISTRICT COURT'S DISMISSAL OF THE ADA CLAIM MANDATED DISMISSAL OF PLAINTIFFS LAD AND COMMON LAW CLAIMS WAS ALSO ERRONEOUS AS A MATTER OF LAW; THE CRITERIA FOR THESE CLAIMS ARE NOTABLY DISTINCT, AS RECOGNIZED BY PREVAILING LAW.
POINT III
THE TRIAL COURT ERRED IN HOLDING THAT THE DISMISSAL OF THE DISTRICT COURT JUDGMENT BARRED THE STATE LAW CLAIMS PRESENTED HERE, WHERE THE ELEMENTS OF THE STATE CLAIMS WERE NOT IDENTICAL TO THE FEDERAL CLAIMS, AND WHERE THE FEDERAL COURT DISMISSALS WERE BASED UPON TECHNICAL ISSUES NOT APPLICABLE HERE.
POINT IV
THE TRIAL COURT ERRED IN FINDING THAT DR. HARRIS COULD NOT DEMONSTRATE THAT THE PURPORTED REASONS FOR MCC'S FAILURE TO PROMOTE HER WERE PRETEXTUAL-OR THAT THE MCDONNELL-DOUGLAS ANALYSIS WAS THE ONLY ROUTE FOR DR. HARRIS TO PROVE ALL HER CLAIMS-WHERE THERE WAS AMPLE EVIDENCE IN THE RECORD, EVEN PRIOR TO ANY DISCOVERY IN THIS ACTION, OF DIRECT ANIMUS TOWARDS HER AS A RESULT OF HER STATUS AS A SURVIVOR OF CANCER AND A MASTECTOMY.
A. McDonnell-Douglas
B. Price Waterhouse
POINT V
THE DISMISSAL OF DR. HARRIS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, PRIOR TO DISCOVERY AND THE PREPARATION OF EXPERT REPORTS, AND IN THE FACE OF OUTRAGEOUS CONDUCT CLEARLY WITHIN THE SCOPE OF THE TORT IN ESTABLISHED CASE LAW, WAS IN ERROR.
POINT VI
SUMMARY JUDGMENT WAS PARTICULARLY INAPPROPRIATE HERE, WHERE PLAINTIFF HAD NO OPPORTUNITY TO CONDUCT DISCOVERY AS TO TWO CLAIMS WHICH WERE NOT PART OF THE PRIOR FEDERAL ACTION.
After filing the appeal, plaintiff was joined by the DCR, as amicus curiae. DCR argues:
THE TRIAL COURT ERRED IN REQUIRING APPELLANT TO DEMONSTRATE THAT SHE SUFFERED FROM A SEVERE OR SUBSTANTIALLY LIMITING CONDITION IN ORDER TO QUALIFY AS "HANDICAPPED" AND ESTABLISH A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION UNDER THE LAD.
The burdens of proof and persuasion are well established for LAD cases:
New Jersey courts have traditionally sought guidance from the substantive and procedural standards established under federal law. Specifically, our courts have adopted the burden-shifting *404 framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove disparate treatment under LAD. Under that framework, a plaintiff must first prove a prima facie case of discrimination. To do so, a plaintiff must show that he or she (1) belongs to a protected class; (2) applied for or held a position for which she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly qualified person. The establishment of the prima facie case gives rise to a presumption of discrimination.
Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent. Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of proof shifts.

[Viscik v. Fowler Equipment Company, 173 N.J. 1, 13, 800 A.2d 826 (2002).]
The LAD is remedial social legislation. Our Supreme Court has stated repeatedly that it must be liberally construed. In Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982), the Supreme Court made it clear that the definition of "handicapped" is not limited to "severe" disabilities:
We reject such an interpretation of the New Jersey statute. We need not limit this remedial legislation to the halt, the maimed or the blind. The law prohibits unlawful discrimination against those suffering from physical disability. As remedial legislation, the Law Against Discrimination should be construed "with that high degree of liberality which comports with the preeminent social significance of its purposes and objects."

[(Citation omitted).]
"The statutory definition of `handicapped,' N.J.S.A. 10:5-5(q), is very broad in its scope. With few exceptions, ... the Law does not define the specific conditions that fall within its sweep." Clowes v. Terminix International, Inc., 109 N.J. 575, 593, 538 A.2d 794 (1988). The goal of the LAD to ensure the civil rights of all citizens "has particular resonance in the area of employment discrimination." Viscik, supra, 173 N.J. at 12, 800 A.2d 826.
The LAD "was amended in 1972 to prohibit employment discrimination against the physically handicapped." Ibid. We have previously held that a plaintiff was "handicapped" within the definition of N.J.S.A. 10:5-5(q) "as a result of the two mastectomies which she underwent as treatment for cancer." Blume, supra, 334 N.J.Super. at 41, 756 A.2d 1019. In Blume, plaintiff was undergoing treatment for a recurrence of breast cancer at the time she was terminated from her position as Vice Principal for Instruction and Curriculum.
N.J.S.A. 10:5-5(q) defines "[h]andicapped" as "suffering from disability, infirmity, malformation or disfigurement which is caused by ... illness ... and which shall include ... any degree of ... amputation...." Plaintiff argues that her mastectomy qualifies as "amputation" under *405 the statute. We agree that a mastectomy qualifies as an "amputation," but the LAD's protections are broader and may include a person with breast cancer even if she is treated with the less radical alternatives available to breast cancer patients. For example, a person treated for non-Hodgkins lymphoma, an incurable form of cancer which does not involve amputation, falls within the protections of the LAD. Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566 (D.N.J.1999).
Here, the trial court erred in its finding that plaintiff failed to establish the first prong of a prima facie case for discrimination under McDonnell Douglas. It is undisputed that plaintiff had breast cancer, underwent subsequent treatment for the disease, and that her employer was aware of the mastectomy.[1] The fact that she suffered no recurrence and that she had minimal limitations on her physical capabilities does not disqualify her from protection under the LAD. Plaintiff must, however, demonstrate the remaining three prongs of McDonnell Douglas before she establishes a prima facie case that will allow her to proceed with her claims.
With respect to the second prong of McDonnell Douglas, the trial judge found that "[p]laintiff offers no evidence that her credentials were equal to or superior to those ... [of] others regarding promotion. More than plaintiff's self-serving testimony is needed to meet this burden."
The Law Against Discrimination allows an employer "freedom to reject those applicants who are unable to do the job, whether because they are generally unqualified or because they have a handicap that in fact impedes job performance. There should be no second-guessing the employer." Andersen, supra, 89 N.J. at 496, 446 A.2d 486. We agree with the trial judge that plaintiff has not demonstrated that she was objectively qualified for the position of associate professor in her initial application for promotion in 1995. At that time, plaintiff had a Bachelor of Science degree in elementary education, a Master of Education degree in student personnel services and twenty-four credits toward her doctorate in adult education. The job requirements for the position she sought were that she have a doctorate plus four years of appropriate experience or a master's degree plus thirty additional graduate credits and ten years of appropriate experience. Plaintiff was still not objectively qualified for the promotion when she applied again in 1998.
In March 2000, plaintiff earned her doctorate in adult education and once again applied for promotion. By this time, plaintiff did meet the objective criteria for the position of associate professor. The trial court erred in finding that the doctrines of res judicata and collateral estoppel precluded plaintiff's failure to promote claim for the year 2000 because the federal claims were dismissed before the employer denied plaintiff's application for promotion in 2000 and the cause of action for that claim arose.
The trial court ruled that even if plaintiff's 2000 claim was not barred under the doctrines of collateral estoppel or res judicata, she was not entitled to further discovery on that claim because (1) she was not "handicapped" under the LAD and (2) she could not overcome the fact that she failed to follow the recommendations of her employer when she was not promoted on previous occasions. In denying plaintiff's motion for reconsideration, the trial judge indicated that he was not persuaded that plaintiff qualified for promotion simply *406 because she had received her doctorate by that time. The trial judge stated:
Plaintiff wants this Court to reason that because Plaintiff has received her doctorate, she automatically was qualified for a position. Plaintiff fails to acknowledge that numerous times she was told about her need to improve her oral and written communication skills. And when plaintiff was told this, she felt she had no room for improvement. A doctorate is not the "golden ticket" that automatically changes a person's attitudes and social skills, making them absolutely qualified.
The trial judge denied plaintiff's request for discovery on the 2000 claims, reasoning that the same witnesses, supervisors and documents would be produced as had been on the 1995 and 1998 claims. While that may be true, plaintiff is entitled to pursue those claims to determine whether she can establish a prima facie case for 2000. We reverse the trial court's dismissal of the 2000 claims and remand the matter for discovery and a determination on the merits of those claims.
Relying on Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 369, 544 A.2d 857 (1988), the trial court dismissed plaintiff's claims for intentional infliction of emotional distress on the ground that she failed to demonstrate that
[1] the defendant acted intentionally or recklessly, and (2) the defendant's conduct must be extreme and egregious, and (3) the defense action must have been the proximate cause of plaintiff's distress, and (4) that the plaintiff's distress must be severe and no reasonable person would be expected to endure it.
The trial judge found further that plaintiff failed to allege any interference with her daily routine.
Generally, it is "rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery" on a claim of intentional infliction of emotional distress. Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 23-24, 766 A.2d 292 (App. Div.2001) (citations omitted). We have carefully reviewed the very extensive record in this case, and we agree that plaintiff has not demonstrated the "level of outrageousness necessary to provide a basis for recovery."
Plaintiff's allegations of intentional infliction of emotional distress are directed specifically to Gordon's conduct. Although Gordon's conduct may be characterized as insensitive, it clearly does not rise to the level of outrageousness. Plaintiff's reliance on Soto v. El Paso Natural Gas, 942 S.W.2d 671, 681 (Tex.Ct.App.1997) is misplaced. In that sexual harassment case, plaintiff had undergone two mastectomies and reconstructive surgery. The plaintiff's supervisor made sexual comments to her, yelled at her, deliberately touched her left breast while reprimanding her, stating that he would not want to touch plaintiff's "plastic boob" and called her "lopsided." The comments made by Gordon that plaintiff alleges were distressing and humiliating to her were not sexual in nature, nor were they "outrageous."
Moreover, we agree with the trial court that plaintiff has not provided any evidence of severe emotional distress. Even considering her certification in opposition to summary judgment, which the trial court declined to do, Shelcusky v. Garjulio, 172 N.J. 185, 797 A.2d 138 (2002), plaintiff has not alleged interference with her day-to-day activities and has not indicated a need for psychiatric counseling. Buckley, supra, 111 N.J. at 369, 544 A.2d 857 (noting that plaintiff had no claim for intentional infliction of emotional distress because he did not demonstrate any interference *407 with his daily routine); Fertile v. St. Michael's Med. Ctr., 334 N.J.Super. 43, 54-55, 756 A.2d 1037 (App.Div.2000), rev'd in part on other grounds, 169 N.J. 481, 779 A.2d 1078 (2001) (holding that plaintiff could not maintain a claim for intentional infliction of emotional distress because she presented no evidence of severe depression requiring extensive treatment.)
In plaintiff's deposition and certification in opposition to the motion for summary judgment, she indicated that she was "emotionally devastated." She claimed that she was "unable to concentrate, made to feel constantly insecure and have extreme loss of self-esteem." She further claims that she was physically unable to work on her doctorate for at least one year and cried excessively. At the time of the motion for summary judgment, however, she had not produced any expert's report to support her claims, although her allegations included conduct dating from July 1994. Nor had plaintiff presented any evidence that she had sought counseling or psychiatric treatment for emotional distress over the seven-year period from the time of her surgery until the grant of summary judgment in the trial court. Accordingly, we affirm the trial court's dismissal of plaintiff's claims for intentional infliction of emotional distress.
Finally, defendant contends that portions of plaintiff's very extensive appendix should be stricken to exclude materials not part of the record below. We agree. Plaintiff's appendix includes various medical journals, newspaper articles and legislation which were not part of the record below. For example, she includes articles about breast cancer and the legislative history for proposed bills relating to breast cancer, such as the Breast Reconstruction Implementation Act of 2001.
R. 2:5-4(a) specifies that the record on appeal "shall consist of all papers on file in the court or courts or agencies below...." Thus, an Appellate Court will not consider evidentiary material which was not part of a record below. State v. Harvey, 151 N.J. 117, 201-02, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000); Burt v. West Jersey Health Systems, 339 N.J.Super. 296, 311 n. 3, 771 A.2d 683 (App.Div. 2001). We, therefore, strike the materials in plaintiff's appendix that were not included in the record below, and we have not considered them in this decision.
The grant of summary judgment for plaintiff's claims of employment discrimination in failing to promote her in the year 2000 is reversed, and the matter is remanded for further discovery on the issues related to the 2000 claims. The trial court's dismissal of all other claims is affirmed for the reasons set forth herein.
NOTES
[1] This is not a case in which the employer did not know of the non-observable disease.