# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1785-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

H.S.,

    Defendant-Appellant.

_____

Submitted March 31, 2020 – Decided May 5, 2020

Before Judges Yannotti, Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 14-03-0190.

Joseph E. Krakora, Public Defender, attorney for appellant (Elizabeth C. Jarit, Deputy Public Defender, of counsel and on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant H.S. was tried before a jury and found guilty of aggravated sexual assault and other offenses. He appeals from the judgment of conviction (JOC) dated September 27, 2017. For the reasons that follow, we affirm in part, reverse in part, and remand the matter to the trial court for resentencing.

I.

On May 18, 2014, a Passaic County grand jury returned Indictment No. 14-03-0190, charging defendant with first-degree aggravated sexual assault, N.J.S.A. 2C14-2(a)(2)(c) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4) (count two); and endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count three). The victim of the alleged offenses was A.A., defendant's stepdaughter.[1]

At trial, M.G. testified that she is A.A.'s cousin. She stated that during the summer months, A.A. usually would visit her and other relatives in North Carolina. In the summer of 2013, A.A. went to North Carolina for M.G.'s wedding. A.A. was supposed to return to New Jersey after the wedding but, with her mother's approval, she remained in North Carolina through August.

---

[1] We use initials to identify A.A. and others to protect the identity of a victim or alleged victim of sexual offenses. See R. 1:38-3(c)(12).

As the time for her return to New Jersey approached, A.A. began to plead with M.G.'s parents to let her remain in North Carolina and attend school there. M.G. testified that she thought this was odd because A.A. usually was ready to return home at the end of the summer and she had never before stated that she wanted to go to school in North Carolina. M.G. and her parents asked A.A. what was going on. Initially, A.A. was reluctant to respond, but she said she just wanted to stay.

M.G. testified that during the first week in August 2013, she and her husband were traveling to Texas. She sent a text to her brother and asked him to have A.A. phone her to discuss why she did not want to return to New Jersey. M.G. thought A.A. would be more comfortable calling her when no one was around. A.A. called and spoke with M.G. and her husband.

They asked A.A. if anything had been going on at school or if she was having problems with her mother. A.A. said no. They then asked A.A. if she was having problems with her stepfather. According to M.G., A.A. was quiet for about a minute. M.G.'s husband asked A.A. if something else was going on. He asked if her stepfather had done something to her.

M.G. testified that A.A. was quiet "for a little bit." She then told M.G. and her husband that her stepfather touched her and had sex with her. M.G.'s

3

A-1785-17T1

husband gave M.G. the phone. She asked A.A. the same question. A.A. again said her stepfather had touched her and they had sex twice.

According to M.G., A.A. began to cry. Her voice was quivering. She said this happened twice in her mother's and stepfather's room. M.G. told A.A. she had to report the matter to the police, but A.A. said she did not want anyone to know. She also said she did not want her mother to find out. M.G. told A.A. they had to report the matter. She called A.A.'s mother and then called 9-1-1. M.G. identified defendant as A.A.'s stepfather.

A.A. testified that she was living with her mother and her grandparents. She described the residence and stated that there were two bedrooms on the first floor. She said that in March 2013, she was fourteen years old and she was in the eighth grade. At that time, A.A. was living with her mother, defendant, grandparents, and her aunt and uncle.

A.A. explained that her mother and defendant were staying on the first floor. They had been married for four years. A.A. said she had a good relationship with defendant. She described her relationship with her mother as "okay." She stated that her mother was strict.

A.A. testified that her mother would not let her have a cellphone, but she had saved her money and purchased one. She said she had a boyfriend and

wanted to text him. She explained that she and her boyfriend had been communicating with each other regularly for about a year. Her mother did not know she had her own phone or a boyfriend.

However, in mid-March 2013, A.A.'s mother saw the phone while A.A. was charging it. A.A.'s mother demanded that she give her the phone. She refused and her mother called the police. The police came to the home and an officer made A.A. give her mother the phone and the password. A.A.'s mother then gave the phone and the password to defendant. A.A. went to her bedroom, which was on the third floor.

Later, A.A.'s aunt told A.A. to go downstairs and get her school uniform. When she entered the living room on the first floor, defendant told her to "come here." He said he needed to speak to her. Defendant started to show her photos that were on the phone. A.A. said she had "naked pictures" on the phone. Defendant complimented her on the pictures. He told her she looked "very sexy" and "very nice."

According to A.A., defendant said she was going to get into trouble when her mother sees the pictures. He asked her if she wanted him to erase the photos, but said he would only do so if she had sex with him. Defendant grabbed A.A. and took her to the room he shared with A.A.'s mother. A.A. said defendant

5

locked the door, pulled her into the bed, pulled his pants down, and stood her up. Then, defendant grabbed her by the neck and put his penis into her mouth. She said defendant moved his penis back and forth for less than a minute.

Defendant paused and put her on the bed. A.A. said she was facing down. She explained that defendant pulled her pants down and put his penis into her vagina. A.A. said she was crying. She could not scream. After about thirty-five minutes, defendant stopped. She pulled up her pants and felt something wet, so she assumed defendant had ejaculated. She unlocked the door and ran back to the third floor. Before she left, defendant told her not to tell her mother.

A.A. testified that she did not tell her mother what had happened because her mother always took defendant's side. She did not tell her aunt because she did not want anyone to know what had happened. She said, however, that in the summer of 2013, she told her cousin M.G. and her husband about the abuse, which was the reason she did not want to return to New Jersey from North Carolina.

On cross-examination, A.A. stated that in October 2016, she was interviewed by a detective from the Passaic County Prosecutor's Office (PCPO) and told the detective that defendant forced her to perform oral sex on him. She admitted that she had never made that statement before. She also acknowledged

that she did not tell her school counselor about the alleged sexual abuse or report it to the police. A.A. said she told an investigator in North Carolina that defendant stated that if she did not have sex with him, he would call the police. She also said she told the investigator she kept telling defendant to stop.

Detective Sabrina McKoy testified that a social services agency in North Carolina contacted the PCPO and reported that A.A. had alleged defendant had sexually assaulted her. McKoy contacted and obtained statements from M.G., her husband, and A.A. She said A.A.'s mother would not cooperate with the investigation.

McKoy and another detective went to defendant's residence. The detectives identified themselves, and defendant agreed to accompany them to the PCPO to discuss the allegations. Defendant was not handcuffed or placed under arrest, and he was informed of his <u>Miranda</u>[2] rights. Defendant indicated that he understood his rights and he agreed to speak with McKoy. He provided a recorded statement, which was played for the jury.

Defendant told McKoy that he was living with A.A. and her mother in a residence in Passaic. He said his wife used to work in a factory. According to defendant, his wife lost interest in having sex with him after someone at work

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

sexually harassed her. He stated that he had a good relationship with A.A. and that A.A. looked at him "like as a guardian or something."

McKoy asked defendant why he thought they were speaking with him. He replied, "Actually there's something yes um uh that I would like to confess." Defendant then told McKoy, "I don't know what's on my mind with all these problems with issues with my wife, like I told you." He stated that one afternoon, he told A.A. he would not say anything about her phone.

Defendant asked A.A. if she could do the same thing to him that she did "with those guys." McKoy asked defendant what he meant by that statement, and he replied, "We had sex." He stated:

> It started like this. . . . I was needing somebody. Somebody for, for having sex. Then in my mind, I don't know what happened. It just went by, why not with [A.A.]. If she, [A.A.] was um wanting some, that's what I thought and we went, yeah, we did it and at the end she left to go to sleep. I sat on the couch and felt bad.

McKoy asked defendant how he convinced A.A. to have sex with him. He said he told A.A. he would not tell her mother A.A. had a boyfriend if she had sex with him. He stated that A.A. performed oral sex on him in the living room before they went into the bedroom to have intercourse. Defendant said he told A.A. he would "delete the [sexual] pictures if, if you and I just do sex." He stated

8

that he could tell that A.A. did not want to have sex with him because she looked sad and at one point stopped for two or three minutes.

When asked whether he forced A.A. into the room to have sex with him, defendant responded, "I wouldn't say force but it can be the word, yeah, more possible that's what actually made me think, that yes it can be, because she didn't want that . . . that day . . ." He also said, "All I can say is whatever she's saying, you know the way she described it, I guess it has to be like that." He conceded that he licked A.A.'s breasts and licked her between the legs.

Defendant also said he had sex with A.A. a second time about two weeks after the first incident. He told A.A. he was "crazy [about] what happened that night" and told her that "she did so good." Defendant said A.A. told him she did not feel good because he was her mother's husband. Defendant told her that this would be the last time.

Defendant also stated that "she didn't want to" but he "grabbed her by the hand and told her let's go." He said he never forced her to have sex, and that she did not tell him to stop. He stated that "she didn't want to [have sex with him]" and he saw her crying about it in her room. He said he ejaculated and did not wear a condom.

A-1785-17T1

The State also presented testimony from Dr. Anthony D'Urso regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). He discussed the five aspects of CSAAS, specifically: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosures, and retraction or recantation. He stated that he did not know anything about the facts of the case, and he never met the victim.

Dr. D'Urso also said he was only testifying about typical behaviors, and he was not there to give an opinion on whether A.A. was telling the truth, or whether she had been abused or not. He stated that he was only in court to "provide information about the differences between the way kids process child sexual assault versus adult matters and to deal with an understanding of things that may appear on face [to be] illogical."

Defendant elected not to testify, and he did not present any witnesses. In her summation, defense counsel argued that A.A. was not credible and asserted that her story "changes every time she tells it." Defense counsel also asserted that defendant's recorded statement was not a truthful confession. She said defendant's words were the "words of someone who's trying to take the path of least resistance."

A-1785-17T1

The jury found defendant guilty on all three counts. Thereafter, defendant filed a motion for a judgment of acquittal or a new trial. He argued that he had been denied a fair trial because the judge refused to use two voir dire questions the defense had proposed for jury selection. The judge denied the motion. After sentencing defendant, the judge entered a JOC dated September 27, 2017. This appeal followed.

Defendant raises the following arguments:

POINT I
THE JUDGE'S REJECTION OF VOIR DIRE QUESTIONS ABOUT WHETHER THE JURORS HAD ANY PRECONCEIVED BIASES IN RELATION TO FALSE CONFESSIONS DENIED [DEFENDANT] A FAIR TRIAL BY AN IMPARTIAL JURY.

POINT II
THE ADMISSION OF CSAAS TESTIMONY WAS IMPROPER, UNDULY PREJUDICIAL, AND DENIED [DEFENDANT] THE FAIR TRIAL GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS.

POINT III
THE JURY CHARGE RELATIVE TO [DEFENDANT'S] STATEMENT WAS INSUFFICIENT TO ADVISE THE JURY OF THE NEED TO CRITICALLY AND EFFECTIVELY EVALUATE THIS STATEMENT IN LIGHT OF THE REALITY THAT JURORS HAVE GREAT DIFFICULTY DISTINGUISHING BETWEEN

11

FALSE CONFESSIONS AND TRUE CONFESSIONS (NOT RAISED BELOW).

POINT IV
THE COURT ERRED BY IMPOSING FINANCIAL PENALTIES ON COUNT TWO AS THAT COUNT WAS PROPERLY MERGED INTO COUNT ONE (NOT RAISED BELOW).

POINT V
RESENTENCING IS REQUIRED BECAUSE THE COURT IMPROPERLY DOUBLE-COUNTED IN FINDING AGGRAVATING FACTORS, MADE FINDINGS THAT ARE NOT SUPPORTED BY EVIDENCE IN THE RECORD, AND PENALIZED THE DEFENDANT FOR REMAINING SILENT.

## II.

We turn first to defendant's contention that the trial judge erred by refusing to use two questions defendant proposed for jury selection. Defendant contends the questions were necessary to determine if the prospective jurors had any preconceived biases regarding "false confessions." We disagree.

Here, defendant requested that the trial judge use the following questions when interrogating the prospective jurors:

> Do you believe that a person would ever confess to a crime they did not commit? Why or why not? If yes, what, other than torture, would cause someone to falsely confess?

> If you were a juror in a case where a person had confessed, then denied the confession, would you be willing to consider that the confession might be untrue?

The judge stated said that the questions might be appropriate if defendant was going to call an expert to describe what to consider when determining if a confession was falsely made. Defendant did not, however, intend to call such a witness. The judge found that under the circumstances, the questions were not appropriate. The judge stated that it was not the court's responsibility "to set forth either party's theory of the case" when selecting a jury.

Rule 1:8-3(a) provides that

> For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath. The parties or their attorneys may supplement the court's interrogation in its discretion.

The rule was adopted to address perceived deficiencies in the jury selection process. State v. Manley, 54 N.J. 259, 281 (1969). The Court noted that it appeared the aim of counsel was no longer to exclude "unfit or partial or unbiased jurors." Ibid. Instead, the aim had become to select "a jury as favorable to the party's point of view as indoctrination through the medium of questions on assumed facts and rules of law can accomplish." Ibid.

Under the rule, voir dire should be "conducted exclusively by or through the trial judges to the extent reasonably possible." Id. at 282. "Supplemental questioning by counsel personally is not foreclosed entirely, but control over its scope and content is left to the experienced judgment and discretion of the trial judge to be exercised with the history and purpose of the rule in mind." Id. at 282-83.

"[T]rial courts must be allotted reasonable latitude when conducting voir dire and, therefore, a reviewing court's examination should focus only on determining whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)). Generally, we will not disturb a trial court's decision regarding voir dire unless the trial judge committed an error that "undermine[s] the very foundation of a fair trial" and "the selection of an impartial jury." State v. Tinnes, 379 N.J. Super 179, 187 (App. Div. 2005).

We are convinced the trial judge did not abuse her discretion by refusing to use the questions that defendant proposed. When denying the request, the judge observed that defendant did not intend to present expert testimony on the subject of false confessions. The judge noted that the apparent purpose of

14

defendant's proposed questions was to pick a jury that was favorable to defendant's point of view. Defendant has not shown that he was denied a fair trial because the judge refused to use his proposed questions.

In support of his argument, defendant relies upon State v. Moore, 122 N.J. 420 (1991). In that case, the Court held that the trial judge had erroneously rejected proposed voir dire questions, which the Court viewed as an attempt to determine whether the prospective jurors would consider an insanity defense. Id. at 453-54. In Moore, the defendant presented expert testimony to support the insanity defense. Id. at 437.

Here, however, defendant presented no testimony, expert or otherwise, to support his claim that his confession was false. He relied solely upon his attorney's argument that the confession was not credible. There is nothing in the record which suggests that the jury would not fairly consider that defense.

Indeed, the judge instructed the jury that it had to evaluate the credibility of defendant's statement and determine what weight, if any, to give to it. We must presume the jury followed the judge's instructions. State v. Morgan, 217 N.J. 1, 16 (2013) (citing State v. Burns, 192 N.J. 312, 335 (2007)).

A-1785-17T1

We therefore reject defendant's contention that he was denied a fair trial because the judge did not use his proposed voir dire questions when selecting the jury.

## III.

Defendant argues that he was denied a fair trial as a result of the admission of testimony on CSAAS. Again, we disagree.

In State v. J.Q., 130 N.J. 554, 556 (1993), the Court held that expert CSAAS testimony was sufficiently reliable to be admitted into evidence. However, while this appeal was pending, the Court decided State v. J.L.G., 234 N.J. 265 (2018), and held that except for testimony about delayed disclosure, "it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony." Id. at 272. The Court stated that

> expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted in criminal trials. Evidence about delayed disclosure can be presented if it satisfied all parts of the applicable evidence rule. See N.J.R.E. 702. In particular, the State must show that the evidence is beyond the understanding of the average jury.
>
> [Ibid. (Emphasis added).]

The Court also stated that if expert CSAAS testimony on delayed disclosure is admitted, the trial judge must provide "appropriate limiting

16

instructions to the jury – both before [the] expert witness testifies and as part of the court's final charge." Ibid. The Court requested "the Committee on Model Criminal Jury Charges to draft appropriate instructions limited to delayed disclosure as soon as practicable." Ibid.

Thereafter, a panel of our court issued its opinion in State v. G.E.P., 458 N.J. Super. 436 (App. Div.), certif. granted, 239 N.J. 598 (2019). The panel held that that J.L.G. announced a new rule of law, which should be applied retroactively to cases in the "pipeline" when J.L.G. was decided. Id. at 443. The term "pipeline retroactivity" means that a new rule of law will be applied to "all future cases, the case in which the rule is announced, and any cases still on direct appeal." State v. Knight, 145 N.J. 233, 249 (1996).

On appeal, defendant argues that we should follow G.E.P. and accord pipeline retroactively to J.L.G. However, we need not decide whether J.L.G. should be applied retroactively. We are convinced that if J.L.G. is accorded pipeline retroactivity, reversal of defendant's convictions is not warranted.

As noted previously, Dr. D'Urso testified regarding all five aspects of CSAAS. If the admission of that evidence was erroneous, the error was not "'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it

otherwise might not have reached.'" J.L.G., 234 N.J. at 306 (quoting State v. Macon, 57 N.J. 347, 335-36).

Dr. D'Urso stated that he did not know A.A. and he was not familiar with the facts of the case. He did not offer an opinion as to whether A.A. had been sexually abused. Furthermore, A.A. testified and the jury was able to assess her credibility.

In doing so, the jurors were able to consider A.A.'s demeanor, her description of the abuse, the delay in disclosing the abuse, her explanation for the delayed disclosure, her fresh complaints to M.G. and her husband, and the reasons she did not inform her mother or other family members of the abuse. The jury also could consider defendant's recorded statement, in which he admitted having A.A. perform oral sex upon him and engaging in sexual relations with her.

Moreover, the trial judge instructed the jury in accordance with the model charge regarding CSAAS testimony, which strictly limited the jury's consideration of such testimony. Model Jury Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011). The judge told the jurors:

> You may not consider Dr. D'Urso's testimony as offering proof that child sexual abuse occurred in this

case. The syndrome is not a diagnostic device and cannot determine whether or not abuse occurred. It relates only to a pattern of behavior of the victim which may be present in some child sexual abuse cases. You may not consider expert testimony about the syndrome as providing whether abuse occurred or did not occur. Similarly you may not consider that testimony as proving in and of itself that A.A., the alleged victim here, was or was not truthful.

We are convinced that in light of testimony presented and the judge's limiting instruction, the admission of Dr. D'Urso's testimony describing the five aspects of CSAAS does not raise a reasonable doubt as to whether the jury reached a decision it would not otherwise have reached. We therefore reject defendant's contention that the admission of the CSAAS testimony requires reversal of his convictions.

## IV.

Defendant argues, for the first time on appeal, that the jury instruction regarding his recorded statement was flawed and requires reversal of his convictions. He contends the instructions failed to advise the jurors to critically evaluate his statement in light of the "reality" that jurors have great difficulty distinguishing between false and true confessions.

"A claim of deficiency in a jury charge to which no objection is interposed will not be considered unless it qualifies as plain error . . ." State v. R.B., 183

N.J. 308, 321 (2005). The legal error in the instruction must have a prejudicial effect upon the defendant's "substantial rights" and be "sufficiently grievous" and convince the reviewing court that, standing alone, the error "possessed a clear capacity to bring about an unjust result." Ibid.

Here, the trial judge instructed the jury regarding defendant's statement, in accordance with the model jury instructions. See Model Jury Charges (Criminal), "Statements of Defendant – Allegedly Made" (rev. Jun. 14, 2010); Model Jury Charges (Criminal), "Redacted Recorded Statement of Defendant" (appv'd Oct. 6, 2014). The judge stated:

> Now, members of the [j]ury, you saw a DVD recording of [defendant], the statement that he gave to police which was already played for you. As you viewed the DVD you likely noticed that there are certain portions of the DVD where the audio or video had been redacted or removed. That redaction was again ordered by the [c]ourt and I instruct you that you should not speculate as to what has been redacted or removed.

> This court has previously made a determination that certain information is of no consequence to this case and should not be heard by you. Therefore what has been redacted or removed is not for your consideration and you should not speculate regarding the same.

> Beyond that which has been redacted you may take into consideration the remainder of the DVD

recording as evidence in this case and you may afford it whatever weight you deem appropriate.

There is as I stated for your consideration in this case a recorded statement made by [defendant]. It's your function to evaluate the statement to determine the credibility of that statement in deciding what weight, if any, to give to it.

In considering whether or not the statement is credible you should take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue if any.

If you find that part or all of the statement is credible you may give what weight you think you deem appropriate to the portion of the statement you find to be truthful and credible.

On appeal, defendant argues that the model instructions are insufficient to address the "phenomenon of false confessions." He contends the following should be added to the model jury charge:

Although nothing may appear more convincing than a defendant's statement, you must critically analyze such evidence. Such statements may be false. Therefore, when analyzing such evidence, be advised that the fact of making a statement, alone, is not an indication of the reliability of the statement.

In support of this argument, defendant relies upon social science research, law review articles, an article in The New York Times, and certain other materials. Defendant did not, however, present these materials to the trial court.

Consequently, the State did not have the opportunity to contest the conclusions set forth therein.  It would be entirely inappropriate for this court to consider these materials for the first time on appeal.  See Harris v. Middlesex County, 353 N.J. Super. 31, 47-48 (App. Div. 2002).

Defendant asserts that there is a "well-documented" tendency on the part of jurors to overemphasize confessions, and trial judges must caution the jury that a confession can and may be false.  We are convinced, however, that the judge's instructions were proper.

Here, the judge informed the jury to consider whether defendant's statement was "truthful and credible" and what weight, if any, should be given to it.  Implicit in the instruction is the understanding that the confession may not have been true.  We are not convinced that a jury needs to be told that the fact that a defendant made a statement indicates that the statement is reliable.

We therefore reject defendant's contention that the instructions were inadequate to guide the jury's consideration of his statement.

V.

Defendant further argues that resentencing is required.  He contends the judge erred in her findings regarding the aggravating factors, failed to make

proper findings of fact, and punished defendant for exercising his right to remain silent.

"An appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). In reviewing a sentence, the court must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record'; [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"An appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

Here, the sentencing judge found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense); two, N.J.S.A. 2C:44-1(a)(2) (gravity and seriousness of the harm inflicted on the victim); three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); four, N.J.S.A.

2C:44-1(a)(4) (lesser sentence will depreciate the seriousness of the offense because defendant took advantage of a position of trust or confidence to commit the offense); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge also found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no prior history of delinquency or criminal activity). The judge determined that the aggravating factors substantially outweigh the one mitigating factor.

The judge merged count two (sexual assault) with count one (aggravated sexual assault), and sentenced defendant on count one to a fifteen-year prison term. The judge required defendant to serve eighty-five percent of that term before becoming eligible for parole, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge also imposed a concurrent seven-year term of incarceration on count three (endangering the welfare of a child). The judge ordered defendant to comply with Megan's Law, N.J.S.A. 2C:7-1 to -23, and imposed various monetary penalties.

On appeal, defendant argues that the judge erred by finding aggravating factor one. He contends that as support for that finding, the judge erroneously relied upon certain uncharged acts of sexual assault. He further argues that the judge erred by finding this aggravating factor because the aggravated sexual

assault for which he was found guilty was not more serious that "others in its class."

Here, the judge noted that in his recorded statement, defendant admitted that he committed aggravated sexual assaults upon A.A. on two separate occasions, specifically penile-vaginal penetration. The judge pointed out that only one such act was necessary to find defendant guilty of aggravated sexual assault. The judge also noted that the jury found defendant had A.A. perform fellatio upon him and that he performed cunnilingus on A.A. The judge correctly determined that these additional acts could be considered as a basis for finding aggravating factor one.

However, even if the judge erred by relying on these other acts, the record provides sufficient support for the judge's finding of aggravating factor one. The judge noted that defendant was the victim's stepfather and he coerced her into performing sexual acts by threatening to reveal "potentially embarrassing, shameful, and inflammatory information" to the victim's mother.

The judge correctly observed that coercion was not an element of the charged offenses. Therefore, the findings of aggravating factor one does not reflect impermissible double counting. See State v. Fuentes, 217 N.J. 57, 76 (2014) (noting that sentencing court may not consider an element of an offense

as an aggravating factor) (citing <u>State v. Towey</u>, 244 N.J. Super. 582, 593 (1990)).

We conclude there is sufficient support in the record for the finding of aggravating factor one. We also reject defendant's assertion that the aggravated sexual assault he committed was no more serious than other such sexual assaults. We therefore reject defendant's contention that the judge erred by finding aggravating factor one.

Next, defendant argues the judge erred by finding aggravating factor two. He contends there was no evidence showing that A.A. suffered any psychological harm as a result of the sexual assaults. Defendant contends the judge merely speculated that A.A. would experience such harm. He also asserts the judge erred by finding aggravating factor two based in part on the relationship between A.A. and defendant.

We note that at trial, M.G. testified that when she disclosed the abuse, A.A. cried and her voice was quivering. The judge reasonably concluded that A.A. had suffered some psychological harm from the abuse, and that the harm will be heightened by the fact that her stepfather was the person who committed the assaults. The judge also reasonably concluded that A.A. would experience some psychological harm from the sexual abuse in the future.

Defendant also contends the judge erred by finding aggravating factor four based upon the breach of trust between a stepfather and his stepdaughter. Defendant contends the judge impermissibly double counted because his relationship with A.A. was an element of counts one and three. We agree.

Although aggravating factor four was relevant to count two, that count was merged with count one for sentencing purposes. Because defendant's relationship with A.A. was an element of the two offenses for which he was sentenced, the judge erred by finding aggravating factor four and applying that factor when sentencing defendant on counts one and three.

Defendant further argues that the judge erred by finding aggravating factors three and nine. Defendant contends the judge found these two aggravating factors in part based on his lack of remorse. He asserts that the judge may not consider a defendant's refusal to admit guilt as an aggravating factor.

However, in sentencing a defendant, the sentencing judge can consider, among other things, a defendant's "prospects for redemption." State v. Poteet, 61 N.J. 493, 496 (1972). In this case, defendant's lack of remorse was relevant to the risk defendant would reoffend and the need for deterrence.

Here, the judge noted that he had considered the evaluation report of defendant that was prepared by the Adult Diagnostic and Treatment Center (ADTC). The report states that defendant had indicated he agreed with certain statements indicating that he excused or rationalized abusive sexual behavior. The judge observed that the ADTC report indicated a clear likelihood or possibility that defendant will reoffend.

Defendant contends the judge erred by taking note of the high rate of recidivism for persons who commit serious and violent sex offenses. He asserts that he represents a low risk for reoffending sexually. He notes that the ADTC evaluation did not find his offenses to be the result of repetitive and compulsive behaviors. Defendant also notes that upon his release from incarceration, he will be compelled to register as a sex offender pursuant to Megan's Law, and he will be subject to parole supervision for life.

We are convinced, however, that there is sufficient evidence in the record to support the judge's findings of aggravating factors three and nine. The judge's observations regarding recidivism by persons who commit sexual assaults is consistent with the legislative findings underlying Megan's Law, where the Legislature noted that sex offenders pose a danger of recidivism. See In re R.B., 376 N.J. Super. 451, 460 (App. Div. 2005) (noting that Megan's Law was

28

intended to protect the public from the danger posed by sex offenders, who are regarded as having a high risk of recidivism).

Furthermore, the ADTC report of defendant's evaluation states that defendant had an average risk of recidivism. Although defendant will be required to register under Megan's Law and he will be subject to parole supervision after he serves his custodial sentence, such measures do not preclude findings of aggravating factors three and nine. The record supports the conclusions that there is a risk that defendant will commit another offense upon his release, and that there is need to deter defendant and others from violating the law.

We therefore conclude that the record supports the judge's findings regarding the aggravating factors, except for aggravating factor four. Because aggravating factor four may have affected the sentences that were imposed, we remand the matter to the trial court for resentencing without aggravating factor four.

VI.

Defendant contends the judge erred by imposing monetary penalties on count two because that count was merged with count one for sentencing purposes.

A-1785-17T1

The JOC states that the judge imposed a total of $7055 in monetary penalties: $300 for the Victims of Crime Compensation Board (VCCB), N.J.S.A. 2C:43-3.1; $225 for the Safe Neighborhood Services Fund (SNSF), N.J.S.A. 2C:43-3.2; a $30 penalty for the Law Enforcement Officers Training and Equipment Fund, N.J.S.A. 2C:43-3.3; a $2400 penalty for the Sexual Assault Nurse Examiner Program (SANEP), N.J.S.A. 2C:43-3.6; a $100 sexual offender surcharge, N.J.S.A. 2C:43-3.7; and a $4000 penalty for the Sex Crime Victim Treatment Fund, N.J.S.A. 2C:14-10. The JOC indicates that the judge imposed three VCCB, SNSF, and SANEP penalties - one for each count.

Here, the judge erred by imposing monetary penalties for count two because that count was merged with count one for sentencing purposes. See State v. Miller, 108 N.J. 112, 116 (1987) (noting that merger is based on the principle that an accused cannot be punished twice for the same offense). The State agrees. We therefore vacate the VCCB, SNSF, and SANEP penalties imposed on count two.

Affirmed in part, reversed in part, and remanded for resentencing in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1785-17T1