**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3947-18T2

ANN FOX and THERESA
CAMPANA,

     Plaintiffs-Appellants,

v.

DGMB CASINO, LLC, d/b/a
RESORTS CASINO HOTEL,
BARBARA HULSIZER, and
MARK SACHAIS,

     Defendants-Respondents.

_____

Submitted April 2, 2020 – Decided August 17, 2020

Before Judges Alvarez, Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1029-16.

Jenna Marie Cook, attorney for appellants.

Cooper Levenson, PA, attorneys for respondents (Amy E. Rudley and Jennifer B. Barr, on the brief).

PER CURIAM

Plaintiffs Ann Fox (plaintiff) and Theresa Campana appeal the April 12, 2019 summary judgment order dismissing their complaint with prejudice. We review the order de novo, considering the issues in a light most favorable to the non-moving parties—plaintiffs—to determine whether there were genuine issues of material fact precluding entry of summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Applying those standards, we reverse and reinstate the Conscientious Employee Protection Act (CEPA) claim, N.J.S.A. 34:19-1 to -14, the counts under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and the intentional infliction of emotional distress (IIED). However, we affirm dismissal of the loss of consortium claim because plaintiffs did not argue that issue in their brief. Thus, the CEPA, LAD and IIED claims are remanded to the trial court for appropriate disposition.

I.

In May 2016, plaintiffs Fox and Campana filed a complaint in the Law Division against defendants DGMB Casino, LLC d/b/a Resorts Casino Hotel (DGMB), Barbara Hulsizer and Mark Sachais (defendants). Plaintiff alleged a violation of CEPA (count one); a hostile work environment under LAD based on gender, sexual orientation and age, and unlawful retaliation (count two); and

IIED and the negligent infliction of emotional distress (NIED) (count three). She requested compensatory and punitive damages for each count and an award of counsel fees and costs. Plaintiff Campana alleged a loss of consortium (count four), seeking damages, attorney's fees and costs. Defendants' answer included separate defenses.

The NIED claim was dismissed in November 2016 and the loss of consortium claim was limited to the derivative IIED claim. Plaintiffs do not appeal that order.

The trial court dismissed the CEPA claim because plaintiff had not suffered an adverse employment action. The LAD retaliation cause of action was dismissed under N.J.S.A. 10:5-12(d) without discussion. The court dismissed the sexual orientation claim because there was no evidence Sachais was aware of plaintiff's sexual orientation or that "[plaintiff] was treated in any manner as a result of . . . sexual orientation . . . ." In considering age and gender discrimination under N.J.S.A. 10:5-12(a), the court found plaintiff "cannot establish any evidence of severe or pervasive harassment sufficient to alter working conditions . . . . There was no adverse employment action targeting [plaintiff]." The court also found no "reasonable fact-finder could conclude that the workplace terms or conditions of employment were altered with regard to

[plaintiff]." The IIED claim was dismissed because the court did not find the elements were established.

We discern the following facts from the record, viewing them in the light most favorable to plaintiff. See Brill, 142 N.J. at 523. Plaintiff was employed by DGMB as the director of security. She was sixty-two and married to plaintiff Campana. Plaintiff worked in the casino industry and specifically at that property for thirty-seven years. The trial court found that as security director, plaintiff "maintained . . . staffing mandates and legal compliance of [Division of Gaming Enforcement (DGE)] regulations." The court found "DGE set mandatory minimum staffing requirements for security personnel," plaintiff was to "submit monthly personnel rosters" to DGE and to "notify DGE if an employee in a mandated staffing position changed their status, and how the affected employee would be replaced." Plaintiff was aware the licensed entity could "seek relief or change from regulated matters as well as staffing."

In 2013, DGMB hired defendant Mark Sachais (Sachais) as Vice President of Hotel Operations. Plaintiff first met Sachais in 2011, when he was working with a consulting firm to evaluate operational efficiencies and cost savings for DGMB, and they discussed potential savings within the security department. Plaintiff recalled disagreeing with Sachais' recommended staffing reductions.

4

Sachais testified in his deposition that plaintiff's responses to "everything were you can't do that, I disagree . . . so pretty much everything was a negative response."

In February 2015, the security department was placed under Hotel Operations, and plaintiff was required to report directly to Sachais. Plaintiff acknowledged she started to make notes about their conversations because she "felt it [was] necessary." Sachais asked plaintiff to recommend staffing reductions within the security department, telling her staffing would be cut one way or another. She objected to staff reductions, believing that DGE regulations required a mandatory minimum level of staffing at certain posts within the casino. Plaintiff claimed she was required to report staffing levels to DGE monthly, indicating whether the employee was full-time, part-time or on-call. She notified DGE of changes in staffing status and replacements. She believed that full-time positions needed to be replaced by full-time and part-time with part-time. In her experience, DGE was not flexible about minimum staffing requirements. When plaintiff advised Sachais in mid-February that two full-time employees with mandated positions resigned, he wanted to replace them with part-time or "on-call" positions, asking her to "hold-off" advising DGE about the loss of the positions. She claims she contacted a person at DGE and

advised that Sachais wanted her to withhold that two mandated positions had been lost. Plaintiff acknowledged that four non-mandated positions were cut at the time when she was reporting to Sachais. She also understood that the CEO of the casino hotel would make any final decisions about staffing cuts.

Sachais required plaintiff to meet with him weekly—after plaintiff suggested it—and to let him know when she was on-site at DGMB. He told her he planned to move her office to the operations floor of the casino although it never had been located there. Sachais moved plaintiff's parking spot—that she had for twenty years— and the parking spots of other personnel to a lot "several" blocks away. She believed this placed her in danger because years earlier her car had been vandalized when she could not park in the casino garage and because her position as director of security left her open to attacks. Sachais suggested taking away plaintiff's administrative assistant, referring to her as a "luxury" although other directors had assistants. Under Sachais, plaintiff no longer had the authority to hire employees; these functions were transferred to subordinates. Plaintiff thought this was to exclude her from her department. She acknowledged, however, that in 2010 she had delegated to shift managers "the ability to keep or let go any person at any time" although she "[a]bsolutely" had hired people after that.

A-3947-18T2

Plaintiff claimed Sachais wanted to "weed out the fat and old female security officers" because "what would these people do if something happened," and that DGMB needed to "get rid of these people." Plaintiff reported that he said,

> [w]e need to get a force in here, we need to get back to youth enforcement people[,] in here, get rid of these girls, what are they going to do if something goes wrong.
>
> . . . .
>
> And my reply was, they would observe and report, as is everyone's responsibility, we're not police officers.

Plaintiff related that "[Sachais] was going to give them physicals and . . . weed them out." He "had Barbara Hulsizer[1] working on an attorney so that they do it the right way." Plaintiff told Sachais she "would not be a part of that discussion" and that she did not "know how that can be that you weed out fat, old females without being a problem." Plaintiff believed all the comments also were directed at her given her age.

On March 11, 2015, plaintiff alleges Sachais told her to "fudge numbers" by hiring full-time staff but scheduling them as part-time employees, and to omit the numbers on a report detailing staff changes to DGE. He told her not to send

---

[1] Hulsizer was the Executive Director of Workforce Development for DGMB.

A-3947-18T2

the staffing report to DGE. Plaintiff objected. She told him that he was "causing a problem for [her] career . . . , [her] reputation with the state." And, she considered that manipulating the numbers on the report would be "criminal behavior."

Plaintiff said she felt sick and reported off for the rest of the day. Thereafter, she applied for, and received, medical leave under the Family Medical Leave Act (FMLA), N.J.S.A. 34:11B-1 to -16, until March 15, 2015. At the end of her leave, she "voluntarily resigned" from her position. Her last day of employment was March 15, 2015. She claims the position of director of security then was filled by a male, who earned more than her.

Plaintiffs appeal the April 12, 2019 summary judgment order raising these issues:

> I. THE TRIAL COURT ERRED WHEN IT DETERMINED THAT PLAINTIFF FAILED TO ESTABLISH SHE SUFFERED AN ADVERSE EMPLOYMENT ACTION AS A DIRECT RESULT OF HER PROTECTED WHISTLEBLOWING ACTIVITY.
>
> II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO PLAINTIFF'S LAD RETALIATION AND LAD DISCRIMINATION CLAIMS BECAUSE PLAINTIFF OPPOSED SACHAIS AND HULSIZER'S EFFORTS TO FIRE WOMEN BASED ON THEIR GENDER, AGE AND APPEARANCE AND BECAUSE PLAINTIFF

HERSELF SUFFERED DISCRIMINATION BASED UPON HER AGE, GENDER AND SEXUAL ORIENTATION.

    A. Plaintiff Established that She Opposed Practices She Believed Violated the LAD and Suffered Reprisals as a result.

    B. Plaintiff Established that She Suffered Severe And Pervasive Harassment Sufficient to Alter Her Working Conditions in Violation of N.J.S.A. 10:5-12(a).

III. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS BECAUSE DEFENDANTS INTENTIONALLY INFLICTED EMOTIONAL DISTRESS UPON PLAINTIFF ANN FOX.

IV. THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AS IT RELATES TO PLAINTIFF ANN FOX'S CLAIMS FOR PUNITIVE DAMAGES.

## II.

We review a trial court's orders granting or denying summary judgment under the same standard employed by the motion judge. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). The question is whether the evidence, when viewed in a light most favorable to the non-moving party, raises genuinely disputed issues of fact sufficient to warrant resolution by the trier of fact, or whether the evidence is so one-sided that one party must prevail as a matter of

law. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016); see also Brill, 142 N.J. at 540. Our review is plenary. Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (providing that an appellate court reviews a summary judgment order applying the same standard as the motion judge).

A.

Plaintiff alleges a cause of action under CEPA. CEPA was intended to protect employees, encourage them to report illegal or unethical activities in the workplace, and discourage employers from engaging in such conduct. Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). CEPA provides, in part that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> . . . .
>
> c. Objects to or refuses to participate in any activity, policy or practice which the employee believes:
>
> (1) is in violation of a law . . . ;
>
> (2) is fraudulent or criminal; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety, or welfare or protection of the environment.

A-3947-18T2

[N.J.S.A. 34:19-3.]

To establish a prima facie case of retaliation under CEPA, a plaintiff must show:

> (1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed the whistle-blowing activity described in [N.J.S.A. 34:19-3(a), (c)]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Kolb v. Burns, 320 N.J. Super. 467, 476 (App. Div. 1999); see also Carlino v. Gloucester City High Sch., 57 F. Supp. 2d 1, 35 (D.N.J. 1999).]

CEPA defines a retaliatory action as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). "[I]n order to be actionable, an allegedly retaliatory act must be 'sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner.'" El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 176 (App. Div. 2005) (quoting Cokus v. Bristol-Myers Squibb, Co., 362 N.J. Super. 245, 246 (App. Div. 2003)). A pattern of conduct by an employer that adversely affects an employee's terms and conditions of employment can qualify as retaliation under CEPA. Beasley v. Passaic Cty.,

11

A-3947-18T2

377 N.J. Super. 585, 609 (App. Div. 2005).  Adverse employment action "can include, . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct."  Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).  "Although actions short of termination may constitute an adverse employment action within the meaning of the statute, 'not everything that makes an employee unhappy is an actionable adverse action.'"  Cokus v. Bristol-Myers Squibb, Co., 362 N.J. Super. 366, 378 (Law Div. 2002) (quoting Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir.1997)).

Defendants acknowledge the first two elements of the test were satisfied.  Plaintiff "reasonably believed . . . her employer's conduct was violating" DGE reporting requirements.  For the second factor, plaintiff arguably performed a whistle blowing activity under N.J.S.A. 34:19-3(a), (c) by objecting to eliminating any mandatory positions or "fudging" the reports to the DGE.  Plaintiff also told the DGE that Sachais did not want her to submit the mandatory report.  The issue, here, is whether the third factor—an adverse employment action—was taken against plaintiff within the meaning of CEPA.

Plaintiff contends the statute was satisfied by these allegations.  She argues her supervisor engaged in a pattern of retaliatory conduct and adverse

12

employment action that stripped her of most of her duties. She was no longer involved in hiring decisions. Her parking spot was relocated to a lot several blocks away that exposed her to risk. She was threatened with the removal of her assistant and relocation of her office, although neither actually occurred. She described this as a de facto demotion. Sachais increased his supervision of her, requiring her to report to him more frequently.

We are required in this context to resolve doubts in plaintiff's favor. See Brill, 142 N.J. at 523. Using that standard, we agree there were factual issues about whether plaintiff was subject to an adverse employment action.

In Green, the case proceeded to trial where the plaintiff alleged that for a two-year period she was subjected to retaliatory acts for reporting a scheme that she believed was fraudulent or illegal. 177 N.J. at 438. The plaintiff took medical leave from her position. Id. at 440. A doctor diagnosed her with a major depressive disorder and related the diagnosis to the situation at work. Ibid. The case was tried before a jury that awarded judgment for the plaintiff on the CEPA claim and punitive damages. Ibid. In analyzing the statute of limitations against public entities, the Court noted that an

> "adverse employment action taken against an employee
> in the terms and conditions of employment" . . . can
> include . . . many separate but relatively minor
> instances of behavior directed against an employee that

may not be actionable individually but that combine to make up a pattern of retaliatory conduct.

[Id. at 448 (citation omitted).]

In Nardello v. Township of Voorhees, 377 N.J. Super. 428, 435 (App. Div. 2005), the plaintiff alleged retaliation actions that included not being able to obtain certain training, being "coerced" to resign as a team leader, being denied the ability to work on certain details, being "removed from the detective bureau" and having his ability to supervise eliminated. He was not terminated, demoted or suspended from his position. Id. at 433. The trial court dismissed his CEPA claim. Id. at 430. We reversed the summary judgment order finding a genuine issue of fact about whether there was a pattern of retaliatory conduct. Id. at 433. We noted that "retaliatory action" under CEPA that did not involve discharge, suspension or demotion "may nonetheless be the equivalent of an adverse action." Id. at 433-34 (quoting Cokus, 362 N.J. Super. at 378).

In Cokus, the plaintiff complained that her anonymity was not protected when she discussed her concerns, her employer did not protect her from "hostility and ostracism by her co-workers and superiors," they disregarded her well-being, gave her a negative performance evaluation and never removed her from the harassment nor the harassers. 362 N.J. Super. at 380-81. The court did not find these amounted to an adverse employment action under CEPA. Id.

14

at 390. This was not severe or pervasive enough to make a reasonable person think their terms of employment had been altered or the working environment was hostile.

Here, although plaintiff was not terminated, transferred nor demoted from her position, arguably there were a number of actions by her employer from which a jury could infer she suffered retaliatory actions. Her parking spot and others were changed to a lot three blocks away, but in her position as director of security, the exposure may have entailed greater risk; she claimed no one explained the move to her even though she had parked in the garage for twenty years. Plaintiff's ability to hire staffing was removed and given to subordinates. She may have delegated some of this in the past but under Sachais the hiring function was removed. He also suggested her office might be relocated and her assistant reassigned. She was required to report more frequently and to advise when she was in the building, things that she had not been asked to do in the past. All of these changes or threatened changes came within a month of Sachais becoming her supervisor. On this record and at this stage of the proceeding, there was a genuine issue of fact that she was subjected to an adverse employment action.

A-3947-18T2

B.

Plaintiff alleges she was subjected to a hostile work environment in violation of LAD based on her age, gender and sexual identity. She also alleges she suffered unlawful retaliation because she opposed defendants' efforts to remove women based on their age or gender.

When reviewing LAD claims, we also consider the burden-shifting framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-04 (1973), and adopted by our Supreme Court. See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982). Under this framework,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Henry v. N.J. Dep't of Human Serv's, 204 N.J. 320, 331 (2010) (quoting Dixon v. Rutgers, the State Univ. of N.J., 110 N.J. 432, 442 (1988)).]

A-3947-18T2

i.

The LAD addresses claims of a hostile work environment based on age, sex or gender identity. Specifically, it is:

> an unlawful employment practice, or . . . an unlawful discrimination:
>
> (a) For an employer, because of . . . age, . . . affectional or sexual orientation, . . . sex, gender identity or expression . . . to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a).]

To state a claim, plaintiff must show: (1) the complained-of conduct would not have occurred but for the employee's age, gender or sexual identity; (2) it was severe or pervasive enough that; (3) a reasonable person would believe; (4) the conditions of employment were altered and the working environment is hostile or abusive. See Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993); Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24 (2002). The parties' subjective response or subjective intent does not determine if there is a hostile work environment. See Cutler v. Dorn, 196 N.J. 419, 431 (2008). Rather, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically

17

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id., at 432 (quoting Green, 177 N.J. at 447).

Plaintiff acknowledged that she did not advise her employer of her sexuality identity. She submitted no evidence that any of the actions of which she complains were animated based on her sexual identity. Therefore, we agree with the trial court that summary judgment was appropriate, dismissing this portion of plaintiff's complaint.

For her claim of hostile work environment based on age and gender, plaintiff alleged that Sachais "berated women in front of me constantly." He showed open hostility to plaintiff and women her age by moving her parking spot, removing her ability to hire staff, threatening to move her office and to take away her assistant, requiring her to meet with him weekly, and calling other people behind her back on certain issues. Plaintiff claims she was constructively discharged.

Some of what plaintiff complains about, by itself, might not constitute a hostile work environment under LAD. Defendants contend the new parking assignments were based on an employee's position in the organization not gender or age. Also, we cannot say that a supervisor, who wants to meet more

18

frequently with his staff or know where they are, is creating a hostile work environment based on a protected category. That said, there are allegations here that Sachais wanted to replace older and heavier women in the security department with younger people to have a "youth force." He wanted to require women to meet certain physical performance standards. Sachais claimed he was working with upper management to make sure this was done in an appropriate manner. We reach no conclusion whether these allegations are true, but the allegations are that age and gender were being targeted in the security department and that plaintiff objected to that. When we consider that in a thirty-two day period of time, plaintiff's ability to hire staffing was removed from her, her long term parking spot was changed to an area that was less secure, she now was more regularly supervised—even though she had no disciplinary history—and older and heavier women were to be weeded-out, we think a reasonable person could conclude that the conditions were severe or pervasive and that plaintiff's conditions of employment were altered. Given the standards by which we are to assess a motion for summary judgment—that we view the evidence in a light most favorable to the non-moving party—we conclude the trial court erred by dismissing this portion of plaintiff's claim.

A-3947-18T2

ii.

Plaintiff alleges a claim under LAD for unlawful retaliation. Under N.J.S.A. 10:5-12(d), it is unlawful for an employer:

> to take reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD] . . . or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the LAD].
>
> [N.J.S.A. 10:5-12(d).]

To establish a prima facie case for a retaliation claim, a plaintiff must show that "(1) [he or she] engaged in a protected activity known by the employer; (2) thereafter [the] employer unlawfully retaliated against [him or her]; and (3) [the employee's] participation in the protected activity caused the retaliation." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 125 (2008) (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)). Additionally, the plaintiff must show there was a reasonable, good faith basis for the complaint that allegedly caused the employer to retaliate. Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 373 (2007).

The test is fact sensitive and the court must review the totality of circumstances presented. El-Sioufi, 382 N.J. Super. at 178. Many separate but relatively minor instances of behavior directed against an employee that are not

20

actionable individually may combine to show a pattern of retaliatory conduct and constitute an adverse employment action. Nardello, 377 N.J. Super. at 435.

We reverse this portion of the April 12, 2019 order, dismissing plaintiff's LAD retaliation claim because the trial court provided no findings or legal analysis. Although we review de novo an order granting summary judgment, we cannot review the decision of the trial court on a blank slate. Estate of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301-02 (App. Div. 2018). Rule 1:7-4(a) requires that "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right . . . ." This was not done, requiring reversal.

Plaintiff alleged she objected to Sachais' statements about replacing old and fat women, requiring women to take physicals to "weed them out" in order to replace them with a "youth force." She claims that because she is the same age that the comments also were directed at her. She claims that because she objected, Sachais retaliated against her by moving her parking spot, increasing supervision, removing her ability to hire staff, and threatening to move her office and remove her assistant. Resolving doubts in plaintiff's favor as we must at

21

this juncture, this is sufficient to satisfy the elements of a prima facie case of retaliation under LAD. Thus, we reverse the order that dismissed this claim.

## C.

Count three of the complaint alleged an IIED claim. To establish IIED, a plaintiff must prove: the "defendant acted intentionally or recklessly," the "conduct was 'extreme and outrageous,'" the conduct proximately caused the plaintiff's emotional distress, and such distress was "so severe that no reasonable [person] could be expected to endure it." Ingraham v. Ortho-McNeil Pharm., 422 N.J. Super. 12, 19-20 (App. Div. 2011) (alteration in original) (quoting Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366-67 (1988)).

The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 20-21 (quoting Buckley, 111 N.J. at 366). Generally, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery . . . ." Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23-24 (App. Div. 2001) (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)).

A-3947-18T2

We disagree with the trial court's dismissal of this claim. At this juncture of the litigation, we are required to view the evidence in a light favorable to plaintiff. In the thirty-two days she worked under Sachais' supervision, plaintiff claims he wanted her to "fudge" reports to the DGE, made remarks about women's appearance and age, wanted to implement physical tests for women to weed them out when she herself would fit the age and gender categories, was threatened with retaliatory conduct such as moving her office and removing her assistant and had her parking assignment changed to a less secure location. Plaintiff alleges Sachais spoke to her in a manner that was "gruff;" he "was barking" at her and she felt she "was being bullied." Plaintiff submitted a report from an examining psychologist that linked plaintiff's emotional distress to these conditions. Looking at the totality of the circumstances alleged, we cannot say there is an absence of material facts on the IIED claim.

D.

Plaintiff requested punitive damages in each count of the complaint where she was seeking relief. She alleges Sachais created hostility and animus in the workplace but that Hulsizer displayed "willful indifference" by not returning her calls and also was assisting Sachais in developing a plan to weed out certain "old" and "fat" women in the security department.

23

An employer can be held liable for punitive damages for violation of LAD if upper management actually participated in the violative conduct or was willfully indifferent to same. Lehmann, 132 N.J. at 624-25. "Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Rendine v. Pantzer, 141 N.J. 292, 314 (1995) (alteration in original) (quoting Berg v. Reaction Motors Div., 37 N.J. 396, 414 (1962)).

Sachais was the director of operations and plaintiff's supervisor. Hulsizer could be determined by the fact-finder as willfully indifferent if she was aware of Sachais' conduct and did not intervene. She might also be an active participant if she was assisting in the development of a plan for Sachais. The punitive damages claims, therefore, should not be dismissed at this time.

E.

We affirm dismissal of the loss of consortium claim by plaintiff Campana. Although she is included as an appellant in the notice of appeal, the appeals brief did not include any argument addressing her claim. Because this issue was not raised in the merits brief, it is deemed waived. Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub.

A-3947-18T2

Safety, Div. of Law, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (noting that claims not addressed in merits brief are deemed abandoned); see Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020).

The April 12, 2019 order is reversed except for dismissal of the loss of consortium claim (count four)—which is affirmed. The case is remanded to the trial court. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-3947-18T2